308 Ga. 749
FINAL COPY

S20A0170.  WALKER v. THE STATE.

BOGGS, Justice.

Appellant Vashon Londell Walker challenges his 2016 conviction for felony murder for the shooting death of his girlfriend, Jessica Osborne. He contends that the evidence was legally insufficient, that the trial court erred in admitting a shell casing and related photographs in violation of his constitutional right to confront his accusers, and that he was denied the effective assistance of counsel. As explained below, Appellant's contentions lack merit. Accordingly, we affirm.[1]

---

[1] Osborne was killed on June 17, 2014. On December 16, 2014, a Muscogee County grand jury indicted Appellant for malice murder, felony murder, aggravated assault with a deadly weapon, and possession of a firearm by a convicted felon. During Appellant's first trial in December 2015, a portion of a recording that the parties had agreed was inadmissible was inadvertently played for the jury as a result of a technical glitch, and the trial court granted the defense's motion for mistrial. At Appellant's second trial in April 2016, the jury acquitted him of malice murder but found him guilty of felony murder and aggravated assault. The firearm charge was bifurcated for trial, and on May 3, 2016, the trial court granted the State's motion to enter an order of nolle prosequi on that charge. On May 10, 2016, the trial court held a sentencing

1. "It is incumbent upon the Court to question its jurisdiction in all cases in which jurisdiction may be in doubt." *Woods v. State*, 279 Ga. 28, 28 (608 SE2d 631) (2005). On November 5, 2019, the State filed a motion to dismiss this appeal, noting that Appellant filed his motion for new trial pro se; the record contains no written order permitting his trial counsel to withdraw; by the time Appellant's current counsel filed an entry of appearance and

---

hearing and pronounced a sentence of life in prison without the possibility of parole for felony murder; the aggravated assault verdict merged for sentencing.

After the pronouncement of the sentence, a question arose as to whether Appellant, who was represented by retained counsel at trial and at the sentencing hearing, wanted to waive his right to counsel and proceed pro se as to a motion for new trial due to a lack of funds. After a colloquy in which the court advised Appellant of his right to appointed counsel and explained the dangers and disadvantages inherent in self-representation, Appellant indicated that he wished to proceed pro se, and the court made a finding on the record that Appellant had freely, intelligently, and knowingly elected to waive his right to counsel and to represent himself. Later the same day, the trial court entered a final disposition. On May 11, 2016, Appellant, acting pro se, filed a motion for new trial. More than a year later, on May 31, 2017, Appellant's current, appointed counsel filed an entry of appearance in the trial court. Appellant, through his current counsel, then amended his new trial motion on June 1, 2017, and again on March 18 and April 18, 2019. After a hearing, on June 21, 2019, the trial court denied the new trial motion. On June 26, 2019, Appellant filed a notice of appeal. The case was docketed in this Court to the term beginning in December 2019 and submitted for decision on the briefs. The State filed a motion to dismiss the appeal, which we denied by order on December 23, 2019.

an amended new trial motion, the 30-day deadline to file a new trial motion had long since passed; and absent the filing of a timely new trial motion in 2016, Appellant's 2019 notice of appeal was untimely by more than three years. The State argued that because Appellant filed his motion for new trial pro se while he was still represented by counsel, his filing was a legal nullity, and this Court therefore lacks jurisdiction over this appeal. See OCGA § 5-6-38 (a) ("A notice of appeal shall be filed within 30 days after entry of the appealable decision or judgment complained of; but when a motion for new trial . . . has been filed, the notice shall be filed within 30 days after the entry of the order granting, overruling, or otherwise finally disposing of the motion.").

The State's motion to dismiss relied primarily on this Court's statement in *Tolbert v. Toole*, 296 Ga. 357 (767 SE2d 24) (2014), that "[a] formal withdrawal of counsel cannot be accomplished until after the trial court issues an order permitting the withdrawal. Until such an order properly is made and entered, no formal withdrawal can occur and counsel remains counsel of record." Id. at 362 (citations

and punctuation omitted). The State also cited this Court's decision

in *White v. State*, 302 Ga. 315 (806 SE2d 489) (2017), in which we

said:

> [A]t a minimum, legal representation continues – unless interrupted by entry of an order allowing counsel to withdraw or compliance with the requirements for substitution of counsel, see [Uniform Superior Court Rule] 4.3 (1)-(3) – through the end of the term at which a trial court enters a judgment of conviction and sentence on a guilty plea . . . .

Id. at 319 (citing *Tolbert*). Accord *Dos Santos v. State*, 307 Ga. 151,

153 (834 SE2d 733) (2019). See also *Jones v. State*, 308 Ga. ___, ___

(840 SE2d 357) (2020) (quoting *Dos Santos*, in turn quoting *White*).[2]

On December 23, 2019, we issued an order denying the State's

motion to dismiss. Unlike this case, *White* did not involve on direct

---

[2] The Court of Appeals has repeated the quoted language from *Tolbert* and *White* in a number of cases. See *Branner v. State*, ___ Ga. App. ___, ___ (___ SE2d ___) (2020) (quoting *Dos Santos*, in turn quoting *White*); *Black v. State*, 349 Ga. App. 111, 115 (825 SE2d 498) (2019) (physical precedent only) (quoting *Tolbert* and *White*); *Cason v. State*, 348 Ga. App. 828, 829-830 (823 SE2d 357) (2019) (same); *Clifton v. State*, 346 Ga. App. 406, 407-408 (814 SE2d 441) (2018) (physical precedent only) (same); *Soberanis v. State*, 345 Ga. App. 403, 404-405 & n.2 (812 SE2d 800) (2018) (same); *Hernandez-Ramirez v. State*, 345 Ga. App. 402, 402-403 (812 SE2d 798) (2018) (quoting *White*). See also *In the Interest of A. B.*, 350 Ga. App. 575, 582 (829 SE2d 842) (2019) (McFadden, P. J., dissenting) (quoting *Tolbert*).

appeal an explicit invocation of a defendant's constitutional right to self-representation. See also *Dos Santos*, 307 Ga. at 154-155 (vacating order denying on the merits the defendant's pro se motion to withdraw her guilty pleas filed during the same term of court in which sentence was entered and remanding the case to the trial court with direction to dismiss the motion as inoperative because the defendant's plea counsel did not request to withdraw from the case until a week after the term of court had ended and the trial court did not enter an order permitting plea counsel to withdraw until more than a week after that); *Jones*, 308 Ga. at ___ (vacating order denying the defendant's pro se motion for out-of-time appeal filed more than five years after entry of convictions and sentence on her guilty pleas and remanding the case for the trial court to hold a hearing on whether the failure to file a timely notice of appeal was due to ineffective assistance of plea counsel). Neither did most of the Court of Appeals cases cited in footnote 2 above.[3] See, e.g., *Cason v.*

---

[3] The only exception is *In the Interest of A. B.*, which quoted *Tolbert* only in the dissent. See 350 Ga. App. at 582 (McFadden, P. J., dissenting).

*State*, 348 Ga. App. 828, 829-830 (823 SE2d 357) (2019) (vacating order denying the defendant's pro se motion to withdraw his guilty plea filed during the same term of court in which sentence was entered and remanding the case to the trial court with direction to dismiss the motion because the record did not contain an order allowing plea counsel to withdraw); *Hernandez-Ramirez v. State*, 345 Ga. App. 402, 402-403 (812 SE2d 798) (2018) (same).

*Tolbert* did involve such an explicit invocation, but *Tolbert* came to us on review of an order denying habeas relief and, more importantly, is factually inapposite. David Tolbert, whose convictions for armed robbery and other crimes had been affirmed by the Court of Appeals, filed a habeas petition alleging among other things that his pro se notice of appeal from the trial court's pretrial oral ruling denying his motion for discharge and acquittal on statutory speedy trial grounds had never been resolved and therefore deprived the trial court of jurisdiction to try him, rendering the resulting judgments of conviction void. See *Tolbert*, 296 Ga. at 357. The habeas court denied relief, and we granted

Tolbert's application for a certificate of probable cause to appeal to consider whether the habeas court erred in ruling that Tolbert had procedurally defaulted his jurisdictional claim. See id. We held that the habeas court's procedural default ruling was erroneous but nevertheless affirmed the judgment denying relief after concluding that, contrary to Tolbert's assertion and the habeas court's assumption, the record on appeal did not show that Tolbert was authorized to proceed pro se when he filed his pretrial notice of appeal in his criminal case. See id. at 358-363.

In the month before his criminal trial was specially set to begin, Tolbert, who was represented by appointed counsel, filed a pro se motion to remove his counsel for alleged ineffective assistance and a pro se motion for discharge and acquittal on statutory speedy trial grounds. See *Tolbert*, 296 Ga. at 357-358. Two days later, the trial court held a hearing and orally denied both motions. See id. at 358. Tolbert then invoked his constitutional right to represent himself, and the trial court, after discussing with Tolbert "why that might be a bad idea," said that it was relieving Tolbert's appointed counsel

and was signing a written order to that effect. Id. If that were all, our decision in *Tolbert* would, as the State argues, dictate that we dismiss this appeal.

But that was not all. In *Tolbert*, even though the trial court said on the record at a motions hearing that it was signing a written order relieving Tolbert's counsel, no such written order appeared in the record. See id. The habeas record did not contain any order permitting Tolbert's appointed counsel to withdraw in the criminal case or even a request for such an order, as required by Uniform Superior Court Rule 4.3. See *Tolbert*, 296 Ga. at 358 & n.5. Moreover, two weeks after the hearing, Tolbert's appointed counsel — who Tolbert claimed had already been relieved from representing him — filed a "Notice of Withdrawal" as counsel of record, which undercut Tolbert's assertion that the trial court had already removed his counsel. See id. at 358. And on the same day that Tolbert filed his notice of appeal pro se — August 1, 2008 — a private attorney signed and served an "Entry of Appearance" on Tolbert's behalf in his criminal case, which further suggested that Tolbert was

never authorized to proceed pro se. See id. at 358-359, 362-363. With that private attorney representing him, Tolbert was tried in August 2008 and again in December 2008, with both proceedings ending in mistrials, and he was tried a third time in 2009, which resulted in the convictions that Tolbert challenged in the habeas court. See id. at 359.

We held that under this particular factual scenario, as reflected in the habeas court record transmitted to this Court on appeal, Tolbert was represented by counsel when he filed his pro se notice of appeal on August 1, 2008, rendering his notice of appeal a legal nullity. See *Tolbert*, 296 Ga. at 362-363. We explicitly noted that it was Tolbert's burden, as the party challenging the habeas court's ruling denying relief, "to affirmatively show error from the record on appeal." Id. at 363.

Nothing similar occurred here. Instead, as explained in footnote 1 above, after the trial court pronounced Appellant's sentence, a question arose as to whether Appellant, who had been represented up to that point by retained counsel, wanted to waive

his right to counsel and proceed pro se as to a motion for new trial due to a lack of funds. After a colloquy in which the trial court advised Appellant of his right to appointed counsel and explained the dangers and disadvantages inherent in self-representation, Appellant indicated that he wished to proceed pro se, and the court made a finding on the record that Appellant had freely, intelligently, and knowingly elected to waive his right to counsel and to represent himself. See *McCoy v. Louisiana*, 584 U. S. ___, ___ (138 SCt 1500, 1507, 200 LE2d 821) (2018) ("[T]he right to defend is personal, and a defendant's choice in exercising that right must be honored out of that respect for the individual which is the lifeblood of the law." (citation and punctuation omitted)).

It may have been preferable for the trial court to sign and file with the trial court clerk a written order granting Appellant's request to proceed pro se. However, Uniform Superior Court Rule 4.3, which addresses attorney requests to withdraw as counsel (either with or without the client's consent) and substitutions of counsel in accordance with the client's wishes, currently does not

require a written order granting an Appellant's request to proceed pro se. The State has not pointed us to any other legal authority requiring the entry of a written order to effectuate the removal of counsel when a criminal defendant invokes his constitutional right to self-representation and that request is granted on the record in open court. And unlike in *Tolbert*, nothing in this record suggests that the trial court's oral order was not understood, by the court or the defendant's existing or replacement counsel, to immediately remove Appellant's counsel without the entry of a written order for the purposes of allowing Appellant to proceed pro se. Thus, the trial court's on-the-record finding that Appellant had freely, intelligently, and knowingly elected to waive his right to counsel and to represent himself was sufficient to make effective Appellant's pro se motion for new trial filed on the next day, May 11, 2016. Cf. *Soberanis v. State*, 345 Ga. App. 403, 403-405 (812 SE2d 800) (2018) (opinion by Ellington, P. J.) (dismissing appeal where the defendant filed his pro se notice of appeal within the same term of court in which sentence was entered on his guilty pleas and the record on appeal did not

show that the trial court had entered an order permitting plea counsel to withdraw and did not contain an on-the-record finding that the defendant had waived his constitutional right to the assistance of counsel on appeal and elected to exercise his right to represent himself). Appellant's motion for new trial was therefore timely, and he filed his notice of appeal within 30 days of the trial court's order denying his new trial motion as required by OCGA § 5-6-38 (a). Accordingly, we have jurisdiction over this appeal.

2. Viewed in the light most favorable to the verdicts, the evidence at trial showed the following. In August 2012, Jessica Osborne and her sister Latasha Houston moved from Mississippi to Columbus, Georgia. They saw and talked to each other every day until April 2014, when Osborne met and began dating Appellant. Appellant isolated Osborne from her sister, limiting their communication and their contact outside his presence. Appellant took away Osborne's cell phone, forcing her to get a new one, and monitored her Facebook messages.

By the end of May 2014, Osborne and her three daughters had moved from an apartment into a house with Appellant at the corner of Forrest Road and Reese Road. Kaylie Kohlbry, a ten-year-old neighbor who lived across Reese Road and down one house from Appellant and Osborne's house, saw Appellant and Osborne on the day they moved in. Osborne was in the moving truck taking out boxes, and Appellant was yelling at Osborne that she was not helping him even though she was the only one doing anything.

On the morning of May 30, 2014, Osborne called Houston. Osborne sounded scared and told her sister that Appellant was being abusive to her, had kicked in the door to her apartment before she moved into the house with him, and had hit her with a gun. After the call, Osborne sent Houston a text message that said not to tell anyone, but

> [j]ust promise me if anything ever happen to me you get my babies and don't let nobody split them up [crying face emoji] their dad's [sic] don't do anything for them now so please Tasha if this guy hurt me... You get my kids and never let them be apart... Love you sis always.

On the morning of June 16, 2014, Appellant waited in the car while

Osborne dropped off her middle daughter with Houston at a playground, and Houston noticed scratches and bruises on Osborne's face.

At about noon on June 17, 2014, Kohlbry was playing outside when she saw Appellant and Osborne in their driveway yelling at each other and heard Appellant tell Osborne that she could "get the 'F' out of the city." Sarah Means lived next to Kohlbry and directly across Reese Road from Appellant and Osborne's house. At about 4:00 p.m. on June 17, 2014, Means was on a raised porch in her back yard when she noticed Appellant and Osborne arguing by a car in their driveway. Means then went inside.

A few hours later, Appellant came out the front door of his house, slammed the door, and retrieved a gun from a silver car in the driveway before going back inside the house and slamming the front door again. Crime scene analysis and evidence regarding Osborne's autopsy indicated that Appellant fought with Osborne in their living room, tearing her blouse and bra, striking her several times in the face and head, and knocking her to the floor. As Osborne

lay on her side, Appellant pressed the gun against her head above her right ear and pulled the trigger, killing her almost instantly. Testing later showed that DNA on the bullet, which traveled through the floor and into the crawl space, came from Osborne.

Around the time of the shooting, Kohlbry, who was on her front porch, saw Appellant retrieve a gun from the silver car and heard the "bang" from the gunshot five to ten minutes later, which scared her, so she went inside. Means had just come out on her back porch and also heard the "bang." Unlike Kohlbry, Means — who by her own admission was being "nosy" — stayed on her back porch to watch what happened across the street. She saw Appellant come out a side door toward the back of his house that faced Reese Road with a cell phone in his hand. Appellant went back inside his house, came out again, and then kicked in his own side door. Appellant then went down the stairs leading from the side door to the ground and turned left to go into his back yard, where he stayed for five to ten minutes. Means could not see what Appellant was doing in the back yard because of his six-foot-tall wooden privacy fence, but she heard him

banging on something that sounded like metal against metal. Appellant then went back inside his house, and the police arrived five to ten minutes later.

Appellant was on his front porch when the first officer arrived. When Appellant saw the patrol car and the officer, he screamed and ran back into the house. The officer told Appellant to come back out, and Appellant complied. Appellant had blood on his shirt and shoes, was acting erratically, and said that his girlfriend had been shot. The officer patted him down for weapons and found none. A police sergeant then arrived and asked Appellant what happened, and Appellant said, "They shot her." The sergeant went inside and saw Osborne's body on the living room floor. An officer who arrived with the sergeant went to clear the house.

The sergeant came back outside and talked to Appellant, who was sitting on the front porch at the top of the stairs. Appellant again said, "[T]hey shot her," adding: "They were looking for my dope, they were looking for my dope, I don't even sell dope." The sergeant tried unsuccessfully to get a description of the alleged

assailants from Appellant, but all Appellant said was that he "did not know who it was." When the sergeant asked about the type of vehicle the assailants were in, Appellant said that it was a pickup truck that was parked down Reese Road. Appellant could not give such details as the color of the truck or the direction in which it left, instead saying, "[A]sk the neighbor, ask the neighbor, the neighbor saw me running after them." The sergeant asked whether the shooter got in on the driver side or the passenger side of the truck, and Appellant did not have an answer.

Appellant, who appeared to be very upset, leaned over and lay on his stomach, and he started pounding the porch, saying that "they shot her." The sergeant attempted to hold down Appellant's hands, but the sergeant's hands slipped off Appellant's forearms and hands, which were wet with water. Appellant then tried to go back into the house, but the sergeant stopped him. Appellant was later taken to the police station. On the way, he was not asked any questions, but he kept asking, "[I]s she okay"?

When Appellant arrived at the police station, he was put in an interview room where he spoke to a lieutenant about what happened. Appellant was not in handcuffs during their discussion and was not under arrest. Appellant told the lieutenant that he and Osborne had just gotten home, that Osborne had gone in the house, and that he was still in the car looking for his cell phone when he heard a scream and a commotion and ran into the house. Appellant said that Osborne was lying on the living room floor with a man who looked like "Mario" standing over her. Appellant claimed that the man said, "You know what this is, give it up," and started walking toward Appellant but turned around and fired a shot back toward Osborne.

Appellant, who had no visible injuries, said that he punched the man, and the man hit him in the head with the gun, kneed him in the face, and elbowed and choked him. Appellant also complained that his hip was sore from the struggle. Appellant said that he got the gun away from the man, but the man eventually got it back, and

Appellant got up and ran to the back bedroom area as the man opened fire, shooting at Appellant at least twice.

Appellant claimed that after a second, he saw the man running out the side door, so he grabbed a hammer and chased after the man out the side door, down the steps, and to the right through a gate into the driveway, where Appellant saw a gray pickup truck on Reese Road peel out and speed away. Appellant did not see the man he was chasing get into the pickup truck. Appellant said that he saw a lady across Reese Road who must have seen the whole thing. Appellant described the gunman as a light-skinned male, 5′8″ tall, with a low, small Afro and a goatee who was wearing a gray, long-sleeved shirt, leather-type batting gloves, and dark blue jeans. When the lieutenant left the room, he learned that there was an order for Appellant's arrest in an unrelated matter, so he returned to the interview room and placed Appellant under arrest.

The lieutenant then went to the crime scene and waited with other officers until a search warrant was signed. The search then began, and a sergeant called and told the lieutenant that Means said

that only one person came out of the house — Appellant — who went into the back yard. The lieutenant went into the back yard and found the gun used to shoot Osborne in a corner hidden under leaves and vegetation. The gun was dry on the outside but wet on the inside, indicating that it had recently been washed off and then dried. A shell casing from a bullet fired from the gun that was used to shoot Osborne was found in the back seat of the silver car parked in the driveway.

At 12:36 a.m. on June 18, 2014, Appellant was advised of his rights pursuant to *Miranda v. Arizona,* 384 U. S. 436 (86 SCt 1602, 16 LE2d 694) (1966), which he waived. He was then interviewed by David Stokes, the lead detective on the case. Appellant told Detective Stokes several times during the interview that the man who kicked down Osborne's apartment door a few weeks earlier was the same person who killed Osborne.

At Appellant's trial, Kohlbry testified that she did not see a pickup truck on Reese Road at all, that she did not see any other cars going up and down the street, and that she did not hear any

tires screeching. Means testified that she did not see Appellant chasing anybody, did not see anybody running down Reese Road, did not hear the sound of screeching tires, and did not see a truck "rushing around the area" or "anything like that," adding that when she heard Appellant across the street after the police arrived yelling about a truck on Reese Road, she laughed, because "[t]here was no truck there." A GBI agent testified that forensic analysis of a gunshot residue kit revealed the presence of gunshot residue on both of Appellant's hands. A GBI footwear and tire print examiner testified that the footprint on the side door that was kicked in matched the shoes that Appellant was wearing when he was interviewed at the police station. The State also presented evidence of other acts of violence by Appellant against two prior girlfriends.

Appellant did not testify. His defense theory was that an unknown intruder committed the murder, that law enforcement rushed to judgment, and that the case was not thoroughly investigated. To support that theory, he called four defense witnesses.

The defense called a GBI forensic serologist who was involved in the case but was not called by the prosecution. She testified that testing of the water in the P-traps underneath the kitchen and bathroom sinks did not reveal the presence of blood. A police officer testified for the defense that he interviewed Means and that she was unable to identify Appellant in a photographic lineup as the shooter, although her description of the clothes worn by the only person who left the house after the shooting and before the police arrived matched the clothes that Appellant was wearing when he was arrested. A private investigator hired by the defense testified that a railing on the stairs leading from the side door to the ground appeared to have been broken recently. And a woman who saw Appellant and Osborne on the day before the shooting testified that they seemed comfortable with each other and appeared to care very much about one another.

When viewed in the light most favorable to the verdicts, the evidence presented at trial and summarized above was sufficient as a matter of constitutional due process to authorize a rational jury to

find Appellant guilty beyond a reasonable doubt of the felony murder of Osborne. See *Jackson v. Virginia*, 443 U. S. 307, 319 (99 SCt 2781, 61 LE2d 560) (1979). See also *Vega v. State*, 285 Ga. 32, 33 (673 SE2d 223) (2009) ("'It was for the jury to determine the credibility of the witnesses and to resolve any conflicts or inconsistencies in the evidence.'" (citation omitted)).

3.     Appellant contends that the trial court violated his right to confront his accusers by admitting State's Exhibits 121-126, which consisted of the shell casing recovered from the back seat of the silver car in the driveway that ballistics testing showed was fired from the gun used to shoot Osborne and photographs of the shell casing and of the location in the car where the shell casing was found. But the Confrontation Clause applies only to testimonial statements, not to inanimate objects that cannot be cross-examined like the shell casing and photographs here. See U. S. Const. Amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."); *Melendez-Diaz v. Massachusetts*, 557 U. S. 305, 309 (129 SCt 2527,

174 LE2d 314) (2009) ("[The Confrontation Clause] guarantees a defendant's right to confront those who bear testimony against him." (citation and punctuation omitted)); *United States v. Herndon*, 536 F2d 1027, 1029 (5th Cir. 1976) ("[The Confrontation Clause] is by its terms restricted to 'witnesses' and does not encompass physical evidence as well."). See also *State v. Williams*, 913 SW2d 462, 465 (Tenn. 1996) (holding that the Confrontation Clause does "not encompass physical evidence or objects, such as photographs," and collecting cases); *Starkes v. United States*, 427 A2d 437, 440 (D.C. 1981) (holding that the defendant's inability to cross-examine a police dog did not violate his rights under the Confrontation Clause).

Appellant also contends that the trial court violated his right to confront his accusers by preventing him from fully cross-examining Corporal James Banville, the crime scene unit officer who collected the shell casing from the car and took the photographs. Specifically, he complains that he was not allowed to ask Corporal Banville why Detective Valerie Holder, who told Corporal Banville

about the shell casing and asked him to photograph and collect it, was terminated by the police department.

When the State moved to admit State's Exhibits 121-126, Appellant objected because Corporal Banville was not the officer who first spotted the shell casing. During a colloquy outside the jury's presence, Appellant claimed that Detective Holder was terminated for improper investigations. The State then made a proffer of Corporal Banville's testimony by questioning him, and Appellant questioned Corporal Banville but chose not to ask if he knew why Detective Holder was terminated or whether it was for conduct related to Appellant's case. The trial court denied the objection.

Appellant never attempted to cross-examine Corporal Banville about why Detective Holder was terminated from the police department. In any event, it was within the trial court's discretion to prevent Appellant from asking Corporal Banville questions that Appellant had not shown that Corporal Banville could answer based on his personal knowledge. See OCGA § 24-6-602 ("A witness may

not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of such matter. Evidence to prove personal knowledge may, but need not, consist of the witness's own testimony. . . ."); *Moss v. State*, 298 Ga. 613, 616-617 (783 SE2d 652) (2016) (holding that the defendant's right to confront his accusers did not require the trial court to allow him "to introduce evidence based purely on rumor, speculation, and conjecture" (citation and punctuation omitted)). See also *Melendez-Diaz*, 557 U. S. at 311 n.1 ("[W]e do not hold, and it is not the case, that anyone whose testimony may be relevant in establishing the chain of custody . . . must appear in person as part of the prosecution's case. . . . It is up to the prosecution to decide what steps in the chain of custody are so crucial as to require evidence; but what testimony *is* introduced must (if the defendant objects) be introduced live." (citations omitted; emphasis in original)). Accordingly, Appellant's Confrontation Clause claim fails.

4. Finally, Appellant contends that he was denied the effective assistance of counsel in two respects. A convicted

defendant's claim that his attorney's assistance was so defective as to require reversal of his conviction generally must prove both that the attorney's performance was professionally deficient and that this deficiency resulted in prejudice to his case. See *Strickland v. Washington*, 466 U. S. 668, 687 (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, the defendant must show that his counsel's acts or omissions were objectively unreasonable, considering all the circumstances at the time and in the light of prevailing professional norms. See id. at 687-690. To establish resulting prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694. If there is no showing of deficient performance, we need not address the prejudice prong. See *Romer v. State*, 293 Ga. 339, 344 (745 SE2d 637) (2013) (citing *Strickland*, 466 U. S. at 697). Appellant has not proved deficient performance in this case.

Appellant claims first that his trial counsel were professionally

deficient in failing to subpoena Detective Holder to testify at trial. But one of Appellant's trial counsel testified that the defense made a strategic decision not to subpoena Detective Holder, because the benefit of her testimony was outweighed by the value of being able to argue, as counsel did, that without it the State could not establish a proper foundation for admission of the shell casing found in the car. "This type of decision-making is classic trial strategy, to which this Court must be highly deferential." *Sifuentes v. State*, 293 Ga. 441, 446 (746 SE2d 127) (2013). Appellant has not shown that this strategic decision by his trial counsel was so patently unreasonable that no competent attorney would have done the same. See *Brown v. State*, 292 Ga. 454, 456-457 (738 SE2d 591) (2013) (reiterating that decisions about what witnesses to call are matters of trial strategy and constitute professionally deficient performance only when they are unreasonable ones that no competent attorney would make). Appellant therefore has not shown deficient performance by his trial counsel in this regard.

Appellant also claims that his trial counsel were professionally deficient in failing to object when Detective Stokes testified that the crime scene looked as if it could have been "staged." But Detective Stokes was the State's last witness, and by the time he testified, the jury hardly would have been surprised to hear that the lead detective thought that the crime scene looked staged, particularly in light of Means' testimony that she saw Appellant kick in the side door and the testimony by the GBI footwear and tire print examiner that the footprint on the side door matched the shoes that Appellant was wearing when he was arrested. Given the lack of a clear benefit to the defense from even a successful objection to Detective Stokes' testimony, it would have been objectively reasonable for counsel to decide not to object to avoid drawing attention to the testimony. See *Babbage v. State*, 296 Ga. 364, 370 (768 SE2d 461) (2015). Appellant therefore has not shown deficient performance in this regard either. Accordingly, his ineffective assistance of counsel claim fails.

*Judgment affirmed. All the Justices concur.*

DECIDED MAY 18, 2020.
Murder. Muscogee Superior Court. Before Judge Land.
*Bentley C. Adams IV*, for appellant.
*Julia F. Slater, District Attorney, Frederick Lewis, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Alex M. Bernick, Assistant Attorney General*, for appellee.