302 Ga. 74
FINAL COPY

S17A0894.  ANDERSON v. THE STATE.

BENHAM, Justice.

James Edwin Anderson was found guilty of felony murder and other crimes arising out of the shooting death of Franklin Ron Burch.[1]  For the reasons set forth below, we affirm.

Viewed in the light most favorable to the verdict, the evidence presented at trial shows that Burch was dating appellant's daughter-in-law Brittany Anderson, who was involved in a divorce proceeding with appellant's son, Edwin Anderson, Jr.  Several weeks before the shooting,

[1]
The crimes occurred on June 29, 2011.  On July 13, 2011, a Wayne County grand jury returned an indictment charging appellant with malice murder; felony murder (aggravated assault); aggravated assault upon Burch; voluntary manslaughter; aggravated assault upon Brittany Anderson; and possession of a firearm during the commission of a felony.  Prior to trial, the voluntary manslaughter charge was nolle prossed.  Appellant faced a jury trial conducted October 15-18, 2012.  Appellant was found not guilty of the charge of malice murder and the charge of aggravated assault upon Brittany Anderson.  Appellant was found guilty of all other charges. The trial court sentenced appellant to life imprisonment without parole for the felony murder guilty verdict, and the aggravated assault guilty verdict merged with the felony murder guilty verdict.  The trial court sentenced appellant to imprisonment for five years for the possession of a firearm guilty verdict to run consecutively to the sentence for felony murder.  Appellant filed a timely motion for new trial which was later amended, but the trial court denied the motion after conducting a hearing.  Appellant filed a timely notice of appeal, and this case was docketed to the April 2017 term of court.  The appeal was orally argued on April 17, 2017.

after learning that Ms. Anderson was seeing Burch, appellant called his daughter-in-law while intoxicated and left voice mail messages in which he threatened Burch, and those messages were played to the jury. On the day of the shooting, appellant's son exchanged angry words with Burch when he went by Burch's house in the afternoon to pick up his five-year-old son, after which Burch got into his vehicle and chased Anderson, Jr., down the road where more angry words were exchanged. Appellant and his wife were in St. Simons Island on a brief vacation, and Anderson, Jr., telephoned his mother to tell her he was upset by the encounter and wanted to bring his son to join his parents and get away from the situation. While waiting for Anderson, Jr., to arrive, appellant and his wife proceeded to a restaurant for dinner. When Anderson, Jr., had not yet arrived when they returned to their hotel room, appellant informed his wife that he was going back home to Wayne County to have a talk with Burch. Appellant testified at trial that he first stopped by his own home to retrieve guns and ammunition out of his locked gun safe because he did not know where his son was and he was concerned that his son might take the guns and either harm himself or others. He admitted, however, that he could have simply taken the key to the locked safe.

2

Appellant loaded all five of his firearms into the covered bed of his truck and started driving toward where he believed Burch lived. At some point he telephoned his daughter and asked her to look up Burch's address. It was well after dark when he drove by that address and while he saw what he believed to be his daughter-in-law's car in the driveway, he could tell the house was unoccupied. Appellant pulled off to the side of the road. Anderson, Jr., having learned that his father had driven back to Wayne County to find Burch, called appellant and asked him not to go to Burch's house, but appellant told his son that he needed to "resolve this." Shortly thereafter, appellant saw a truck that he believed to be Burch's pull into the driveway of Burch's house. Appellant had already retrieved the rifle from the back of the truck and placed it on the front seat, and he had placed a Colt .45 semiautomatic in the pocket of the passenger door. Appellant knew the rifle had one round in it, and although several other rifle cartridges were found in the cup holder of his truck after he turned himself in, appellant denied they had ever been loaded into the rifle. Appellant pulled his vehicle into Burch's driveway and saw Ms. Anderson inside the open garage near the door to the house. Appellant grabbed his rifle, went to the front of his vehicle, and saw Burch standing near the garage. Appellant testified he took

3

the rifle with a scope with him as he exited the vehicle, but not one of the handguns, because the rifle would be easier for Burch to see in the dark. According to appellant, he wanted to have the rifle with him as a "symbol" to keep Burch from possibly "jumping on me," since he knew Burch was younger and in better physical condition. In a recorded statement appellant gave to the investigator who interviewed him when he turned himself in later that evening, he repeatedly stated that he took the rifle out of the truck because he wanted to scare Burch but that he had no intention of harming him. He loaded one bullet in the rifle thinking that he might shoot into the air if necessary to scare Burch.

In the recorded statement, appellant stated that when he saw Burch coming at him after he exited his truck, he decided to strike him in the stomach with the barrel of the rifle so that Burch would bend forward and appellant could then tell him that he just wanted to talk. In that statement, appellant claimed the two men did not struggle over the rifle but that, instead, it simply went off while he had the barrel pressed against Burch's stomach. He told the investigator he had the rifle repaired in the 1990s because it had misfired and he believed that may have been what had happened on the night in question because he had fired the weapon only a few times in the many

4

years he owned it. At trial, however, appellant testified that when Burch came toward him Burch reached for the rifle and the two men engaged in a "[t]ug of war," as Burch tried to "tear it out of my hands." At that point, according to appellant, the gun discharged. He was not sure what had happened, or whose hand was on the trigger when the gun went off, but he saw blood "everywhere" and panicked, got into his truck, and drove away.

Ms. Anderson testified at trial that she was inside the open garage when appellant pulled into Burch's driveway, and when she saw appellant get out of his truck "toting" a long gun at his side she hollered, "No, Big Edwin [the name she called appellant], no." She remembered Burch's hands going up, and as appellant walked around the front of the truck steadily approaching Burch, Burch said, "No, man, no." She saw Burch take maybe two steps back and then she saw him bent over with his hand on the barrel of the gun. She heard the gun go off, after which Burch slumped to the ground. On cross-examination, Ms. Anderson acknowledged that on the night of the shooting the investigating officer asked her if there had been a struggle and she had responded affirmatively, but at trial she rejected defense counsel's characterization that a "struggle" ensued between appellant and the victim over the gun. Instead, she explained that there was never a fight over the

gun, but that she saw Burch bent over with his hands on the end of the barrel as the gun was pressed into his stomach.

Emergency medical personnel were called and arrived at the scene, as did the Screven Police Chief. Efforts to revive Burch were unsuccessful, and he died at the scene. After speaking by telephone with his wife and daughter, appellant turned himself in to the authorities and gave the statement that was recorded. Pursuant to a warrant to search appellant's truck, the agent who took appellant's statement found a .308-caliber rifle and four other firearms, along with four .308-caliber cartridges and other ammunition. DNA testing confirmed that blood found on the driver-side tire was Burch's. The forensic pathologist who conducted an autopsy of Burch's body testified at trial that Burch died from a gunshot wound at near contact range to the abdomen, and that parallel scrapes appearing on the victim's chest were the result of the barrel of the gun and the gun scope scraping over Burch's skin. He also identified an abrasion on the victim's left lower abdomen. Firearms testing confirmed that the metal jacket recovered from Burch's abdomen during the autopsy was fired from the rifle found in appellant's truck.

1.    Although appellant does not challenge the sufficiency of the evidence to sustain the convictions, this Court regularly conducts an

6

examination of the record to determine the legal sufficiency of the evidence in murder cases. We conclude the evidence adduced at trial and summarized above was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that appellant was guilty of the crimes of which he was convicted. See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

2.    Appellant asserts the trial court erred in denying his motion for new trial because during voir dire one of the jurors, who is identified in this opinion by his initial "H.," improperly concealed his connection to the case and his bias toward the victim. Appellant asserts a defendant is entitled to a new trial based on juror misconduct if the defendant is able to demonstrate that "(1) the juror failed to answer honestly a material question on voir dire and (2) a correct response would have provided a valid basis for a challenge for cause." See *Glover v. State*, 274 Ga. 213, 214 (2) (552 SE2d 804) (2001). The problem with that argument is that the record does not demonstrate that H. failed to give honest answers to voir dire questions.

(a) During voir dire, H. answered all questions that were asked of him. He disclosed, in response to questioning, that he was appellant's neighbor; that his father and appellant's father had been friendly business competitors;

7

that he considered himself to be a personal friend to the victim's father; that he knew Brittany Anderson and Anderson, Jr., who had been his neighbors; and that he had been personal friends with the Chief Assistant District Attorney for forty years, was friends with the sheriff, and knew the Screven Police Chief (who was identified as a witness and later testified at trial). The record shows the crimes were committed and the case was tried in a rural county where many individuals and families are acquainted and have numerous interconnections. In fact, other members of the jury array also answered that they were acquainted with persons connected to the case. With respect to each person H. identified as being a friend or acquaintance, he stated that he could nevertheless be impartial and fair, and could make a decision based solely on the evidence. With respect to those individuals he said he knew who were identified as potential witnesses, H. stated his acquaintance would not cause him automatically to believe the witness. The answers H. gave during voir dire regarding these persons were consistent with the testimony he gave at the hearing on the motion for new trial, except that at the motion hearing H. gave additional details in response to additional questions the parties asked him. Appellant has failed to demonstrate that H. failed to give honest answers to the questions he was asked regarding his

8

knowledge about or acquaintance with persons identified to him in voir dire.

The same can be said regarding H.'s answers regarding his occupation. H. answered on voir dire that he was employed by the local funeral home which handled the arrangements for Burch's funeral, and that he had conversations with both the Burch and Anderson families associated with his duties at the funeral home. He mentioned that he was referred to as a mortician. No follow-up questions were asked with respect to these disclosures. At the motion for new trial hearing, however, H. disclosed in response to more detailed questioning that he embalmed Burch's body, and confirmed that at that time he had the opportunity partially to inspect and view the gunshot wound and abrasions on the body. Appellant argues that as the decedent's embalmer, he would have been qualified to testify that the victim had sustained a gunshot wound. See *Young v. State*, 232 Ga. 285, 289 (206 SE2d 439) (1974). But in the current case, that the victim had died from a gunshot wound was an undisputed fact, and H. was not identified as a potential witness prior to trial. Consequently, H. was not a known prospective witness who was subject to being excused for cause upon a proper motion. Compare *Lively v. State*, 262 Ga. 510, 511 (1) (421 SE2d

9

528) (1992) (a juror with close connections to the victim, who had given the victim "fatherly advice" concerning her relationship with the accused, and who was listed as a State's witness should have been excused).

As noted, H. disclosed that he knew a number of individuals connected to the case, including both the victim and the accused, as well as their respective families. Relying upon *Lively*, supra, appellant argues that a close relationship between a juror and the victim and the victim's family prevents the juror from rendering an impartial verdict despite the juror's testimony that he could be a fair and impartial juror. But the degree of the juror's involvement with the victim in *Lively* is distinguishable from the juror's involvement in this case. Not only did that juror know the victim and her family, he had discussed with the victim her relationship with the accused and had given her "fatherly advice" concerning that relationship and other matters that might be brought out at trial. The juror had also discussed the relationship between the victim and the accused with the accused, himself. Demonstrating the close relationship between the juror and the victim's family, he was asked to serve as a pall bearer at her funeral, and did serve. The juror also testified he had expressed his remorse to the victim's family about her death. Given these facts, this Court held that, regardless of the

juror's testimony that he could be impartial, the record failed to support the trial court's finding "that the juror could put aside his close relationship with the deceased and his personal knowledge of her difficulties with the defendant and render an impartial verdict based solely on the evidence presented at trial." *Lively*, supra, 262 Ga. at 511 (1). Moreover, in *Lively*, the juror was identified as a potential State's witness. H. testified at the motion for new trial hearing that he greeted the Burch family when they arrived at the funeral home to make funeral arrangements and that he hugged them and expressed condolences for their loss, but this conduct does not rise to the level of connection with the victim and his family as that involved in the *Lively* case. H. did not attend the victim's funeral.

H. disclosed during voir dire that he was acquainted with, or even friends with, several persons who were scheduled to testify at trial, and appellant asserts this prevented him from being an unbiased juror. In particular, appellant points to H.'s answer in response to questioning at the motion for new trial hearing that he would testify, if asked, to the good character and truthfulness of the Chief of Police of the Screven police department, who was the first law enforcement officer to arrive at the scene of the shooting and who testified at trial about what he observed. Appellant

11

argues this demonstrates juror bias in that H. was predisposed to believe this State's witness. In this case, however, the witness in question offered no expert testimony, and the testimony about his first-hand observations involved no disputed issues. H. testified similarly when asked whether he could testify to the good character and truthfulness of another person who was identified prior to trial as a potential witness but who was not called. Neither party asked such questions of H. during voir dire. Accordingly, appellant has failed to demonstrate that H. failed to answer voir dire questions honestly. Neither has appellant shown H. was a biased juror. Appellant's reliance on cases that involve intentional misrepresentations by a juror on voir dire,[2] or unreasonable failure to disclose relevant information in response to questions on voir dire[3] are inapposite to the facts of this case and unpersuasive with respect to appellant's assertion that he is entitled to a new trial for juror misconduct on the basis of implied bias.

---

[2] See *Dyer v. Calderon*, 151 F3d 970 (9th Cir. 1998) (discussing implied juror bias in a case in which the juror had given untruthful answers to voir dire questions); *United States v. Perkins*, 748 F2d 1519 (IV) (11th Cir. 1984) (juror had made intentional misrepresentations during voir dire and actual bias was shown by this dishonesty, and the juror's knowledge of the defendant was used during the deadlocked jury's deliberations).

[3] See *United States v. Scott*, 854 F2d 697 (5th Cir. 1988) (the juror's testimony at the motion for new trial hearing regarding his reasons for not disclosing relevant information during voir dire raised a sufficient implication of bias to require a new trial).

Because appellant has failed to demonstrate that H. answered questions dishonestly during voir dire, he has failed to meet the requirements of the first prong of the two-pronged test set forth in *Glover* for determining whether a defendant is entitled to a new trial for juror misconduct — that the juror failed to give honest answers to voir dire questions. The trial court did not err in denying the motion for new trial on this ground. See *Downey v. State*, 298 Ga. 568, 571 (3) (783 SE2d 622) (2016) (to prevail on a juror misconduct claim the defendant must satisfy both the required prongs for establishing such a claim).

(b) Appellant further argues that H. had knowledge about the victim's wounds, including the abrasions on the victim's chest and abdomen, and thus had exposure to extrinsic physical evidence in the case that other jurors did not have. Relying on *Remmer v. United States*,[4] appellant argues this extrinsic knowledge should be deemed presumptively prejudicial. In *Remmer*, however, a juror had been contacted during trial by a person who suggested to him that he could profit from returning a verdict favorable to the defendant. That comment was reported to the trial court and investigated by the Federal Bureau of Investigation, but the defendant and his counsel were

---

[4] 347 U. S. 227, 229 (74 SCt 450, 98 LE 654) (1954).

not informed. The United States Supreme Court held that such private communications or tampering with a juror during trial "is, for obvious reasons, deemed presumptively prejudicial," and that under such circumstances an evidentiary hearing was required to determine the impact of the communications on the juror and whether it was, in fact, prejudicial to the defendant. Id. at 229-230. Of course, this case does not involve private communications during trial. Moreover, in this case, an evidentiary hearing was conducted in response to the motion for new trial at which H. testified that the decisions he made as a juror were based solely upon what he saw and heard in the courtroom and upon the trial judge's instructions. No evidence was presented that H. discussed his observations of the victim's body with other members of the jury. Compare *United States v. Perkins*, 748 F2d 1519 (IV) (11th Cir. 1984). Based upon the evidence and argument at the hearing, the trial court did not err in concluding no prejudice was shown.

Appellant further argues that juror H. had knowledge and information that other jurors did not have. But photographs of the victim's body taken prior to the embalming were admitted into evidence and given to the jury, which clearly depicted the gunshot wound and the scrapes on the victim's body. The primary contested issue at trial was whether appellant and the

victim engaged in a struggle that caused the gun to fire. According to appellant, the abrasions on the victim's body constituted evidence of a struggle, whereas, in closing arguments, the prosecutor argued the evidence showed appellant had used the barrel of the rifle as a bayonet. But appellant did not establish that H. had formed any opinion about this issue based on his viewing of the body as the embalmer. In fact, as noted, he testified he based his decision on the evidence presented at trial. Again, appellant has failed to demonstrate prejudice.

Moreover, returning to appellant's enumeration of error, he has failed to demonstrate that H. failed to give honest answers to voir dire questions about his employment at the funeral home. Appellant argues that H. improperly failed to disclose the "whole truth" as to his role in the victim's funeral arrangements, but appellant provides no authority for a requirement of a juror to give anything other than truthful answers to voir dire questions, and he fails to demonstrate that this juror gave responses that were untruthful or unresponsive. Pretermitting the issue of whether juror misconduct might be shown if a juror provided technically truthful, but misleading, information on voir dire regarding an issue that might be prejudicial to the defendant, that is not what happened in this case. At the commencement of voir dire, the

15

jurors were asked to raise their right hand and swear they would "give true answers" to the questions asked regarding their qualifications as jurors in the case. After H. disclosed his employment, counsel for the State and the defendant were permitted to pose additional questions. It was at that point that H. volunteered that the funeral home where he was employed handled the arrangements for the victim's funeral. Reference to H.'s employment at the funeral home was made several more times during voir dire, but neither party asked what role, if any, H. played in the handling of the victim's funeral arrangements. Appellant has failed to demonstrate this juror improperly concealed any facts surrounding his involvement with the victim's body or that he was prejudiced by the juror's involvement.

3. Appellant asserts trial counsel provided ineffective assistance by failing to ask questions on voir dire that would have uncovered the reasons why juror H. was not qualified to sit on the jury, including the extent of his relationships with persons involved with the case, his personal bias, and his personal handling and viewing of evidence. As set forth in Division 2, however, appellant has failed to demonstrate that this juror was not qualified to sit on the jury or that he was subject to a challenge for cause. Accordingly, even if appellant could demonstrate trial counsel failed to

16

exercise reasonable professional assistance during voir dire, appellant fails to establish the required showing of prejudice resulting from counsel's conduct, as required by the test set forth in *Strickland v. Washington*.[5]

4.	Appellant also asserts trial counsel was ineffective in failing to conduct an adequate investigation of the defense that the rifle fired accidentally as a result of a struggle between appellant and the victim, and in failing to present expert testimony that would have supported that defense. Trial counsel's testimony at the motion for new trial hearing, however, established that he worked with a private investigator while preparing for trial, that he reviewed the medical examiner's report, and reviewed the photographs of the victim's wounds. Counsel admitted that, in hindsight, it would have been reasonable for him to consult with an expert, such as a crime scene expert or firearms expert, to determine if there was evidence of a struggle that would have provided additional support for the accident defense. He testified, however, that at the time he tried the case he believed the evidence was clear that the parties had struggled over the gun; and the law is well settled that decisions relating to trial strategy and tactics are not to

---

[5]	466 U. S. 668, 694 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984) (requiring both deficient performance of professional assistance of defense counsel as well as a showing of prejudice as a result thereof).

17

be judged by hindsight. See *Grissom v. State*, 296 Ga. 406, 412 (4) (768 SE2d 494) (2015). From counsel's testimony, it is clear that the decision not to retain an expert witness was not due to a lack of preparation or investigation but was a strategic decision based on counsel's opinion that the evidence was sufficiently straightforward so as not to require an expert on the defense of accident. "Absent a strong showing that counsel's actions were not reasonable, we will presume that [trial] strategies were not deficient." (Citation and punctuation omitted.) *Watkins v. State*, 285 Ga. 107, 110 (3) (b) (674 SE2d 275) (2009). Contrary to appellant's assertion, he has failed to demonstrate that counsel's strategic decisions in this regard were not reasonable as a matter of law under the circumstances of this case. See *Scott v. State*, 290 Ga. 883, 889 (7) (b) (725 SE2d 305) (2012).

The medical examiner who testified at trial was called as a witness at the motion for new trial hearing, and in response to questioning he answered that the abrasions on the victim's body could have been associated with a struggle over the firearm involved in the shooting. He also said they might not have been associated with a struggle, and the witness agreed with the prosecutor that, instead, the marks could have been caused by the upward recoil of the gun after it fired. Appellant faults trial counsel for his failure to

18

cross-examine the medical examiner at trial, thereby establishing by the State's own witness that the evidence was consistent with a struggle. The medical examiner did testify at trial that the abrasions on the victim's body were consistent with the barrel of a gun scraping over the victim's skin. From this testimony and evidence, the jury could have deduced that the parties engaged in a struggle even in the absence of an explicit question to and answer from an expert witness. Additionally, the testimony of the medical examiner at the motion hearing demonstrates his testimony likely would have been equivocal, in any event. Given trial counsel's testimony that he believed a struggle was clear from the evidence, appellant has failed to carry the burden of showing trial counsel's failure to cross-examine the medical examiner was not reasonable.

Because appellant has failed to demonstrate that trial counsel's performance, with respect to presenting evidence to support his self-defense claim, did not fall "within the wide range of reasonable professional assistance,"[6] appellant has failed to meet the required deficient performance prong of the *Strickland* test. The trial court did not err in denying appellant's motion for new trial on this ground.

---

[6] *Gill v. State*, 295 Ga. 705, 708 (2) (763 SE2d 719) (2014).

5. Trial counsel's testimony at the motion for new trial hearing established that he made a reasoned decision to present the defense that appellant initially acted in self-defense when he thrust the rifle into the victim's abdomen, but that the victim was shot accidentally after the victim commenced fighting with appellant over the gun. Accordingly, pursuant to the facts of the case, counsel pursued the unusual strategy of both a self-defense theory and an accident theory, and the trial court gave jury instructions on both theories. Appellant asserts, however, that trial counsel provided ineffective assistance of counsel by his failure to request a charge on involuntary manslaughter. According to appellant, the evidence supported an involuntary manslaughter charge; and if requested, the trial judge would have given such a charge; and if given, it is reasonably probable that the jury would have returned a verdict on this lesser included offense. At the motion for new trial hearing, however, trial counsel testified that he never intended to claim involuntary manslaughter in light of the defenses of self-defense and accident because he did not believe all these charges could or should be given. The trial court properly held an instruction on involuntary manslaughter would have been inconsistent with appellant's alternative

defenses of self-defense and accident and thus denied the motion for new trial with respect to this claim.

Pursuant to OCGA § 16-5-3 (a), a person commits involuntary manslaughter "in the commission of an unlawful act when he causes the death of another human being without any intention to do so by the commission of an unlawful act other than a felony." In this case, appellant asserted the defenses of self-defense and accident, and the trial court gave instructions on these two defenses. But neither self-defense nor accident are unlawful acts at all. Consequently, involuntary manslaughter is inconsistent with both the defense of self-defense and the defense of accident. Not only has appellant failed to demonstrate trial counsel's decision not to request an inconsistent involuntary manslaughter charge was unreasonable, he has also failed to demonstrate he was prejudiced by that decision. See *Williams v. State*, 298 Ga. 208, 219 (9) (779 SE2d 304) (2015). Accordingly, ineffective assistance of counsel is not established.

6.     Appellant presented a character witness, and during the State's cross-examination of the witness the prosecutor asked him whether it would change his opinion of appellant if he knew of certain alleged instances of appellant's conduct, including an instance of domestic violence associated

with appellant's consumption of alcohol when the police were called by appellant's wife. The witness testified he did not know of that alleged conduct, and also testified it would not change his opinion of appellant's good character if it were true given his extensive experience of working with appellant. During closing argument, the prosecutor referred to appellant as one who "gets into disputes with his wife and the police have to come." Appellant's counsel objected on the ground that the prosecutor referenced facts not in evidence, but the trial court stated in the jury's presence, "the jury will be the judge of what's in evidence or not in evidence." After closing argument, and outside the presence of the jury, appellant's counsel renewed his objection, and argued that an announcement by the court that the jury would be the judge of what's in evidence was an insufficient curative instruction. Counsel for both parties debated with the trial judge about what would be an appropriate response to appellant's objection, given the constraints upon the court not to comment on the evidence, as well as the possibility that an instruction would simply draw more attention to the statement about the disputed fact. The judge asked counsel for a suggested approach to the problem, and appellant's counsel responded that he was

seeking a mistrial, but that if the court did not grant a mistrial they "would just have to move on." The motion for mistrial was denied.

As part of the jury instructions that followed, the trial court stated that neither the opening statements or closing arguments of the lawyers, nor the questions asked by the lawyers, constituted evidence. The trial judge also gave an appropriate charge regarding the jury's consideration of character evidence. In response to the trial court's inquiry to counsel at the end of the jury charge, appellant's counsel stated he had no exceptions to the charge.

Citing OCGA § 17-8-75,[7] appellant argues the trial court abused its discretion when it denied the motion for mistrial and gave an inadequate curative instruction that failed to rebuke the prosecutor for making prejudicial statements not in evidence. After the character witness answered that he was unaware of the domestic dispute, the prosecutor did not present evidence to establish the incident occurred. Nevertheless, in his closing argument the prosecutor referenced "disputes," plural, in which the police

---

[7]
    OCGA § 17-8-75 states:
> Where counsel in the hearing of the jury make statements of prejudicial matters which are not in evidence, it is the duty of the court to interpose and prevent the same. On objection made, the court shall also rebuke the counsel and by all needful and proper instructions to the jury endeavor to remove the improper impression from their minds; or, in his discretion, he may order a mistrial if the prosecuting attorney is the offender.

had to be called.  Appellant asserts the prosecutor's comment improperly implied multiple instances in which the police responded to domestic disputes, and that the comment unduly influenced the jury to believe appellant had engaged in domestic violence on multiple occasions, none of which was in evidence.  He claims this entitles him to a new trial.

Pretermitting whether trial counsel's failure to renew his objection to the closing argument or to renew his motion for mistrial served to waive the issue for appellate review, we find no reversible error.  A trial court's error in not fulfilling its duty under OCGA § 17-8-75 is subject to harmless error analysis.  See *Arrington v. State*, 286 Ga. 335, 345-346 (16) (a) (687 SE2d 438) (2009) (finding harmless error in trial court's failure to rebuke the State in response to prosecutor's misstatement of evidence during closing argument, where improper statement consisted of one sentence, was interrupted by defense counsel's objection, and trial court immediately observed that the "jury w(ould) remember the evidence," and where other inculpatory evidence rendered it highly probable that the error did not contribute to the guilty verdicts).  In light of the substantial evidence against appellant, as well as the jury instructions given, it is highly probable that neither this statement by the prosecutor in closing argument, nor any alleged

failure of the trial court to comply with OCGA § 17-8-75, contributed to the verdict.

Judgment affirmed. All the Justices concur.

Decided September 13, 2017.

Murder. Wayne Superior Court. Before Judge Kelley.

Law Firm of Shein & Brandenburg, Marcia G. Shein, Leigh S. Schrope, for appellant.

Jacquelyn L. Johnson, District Attorney, Andrew J. Ekonomou, Assistant District Attorney; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy Attorney General, Paula K. Smith, Senior Assistant Attorney General, Elizabeth M. Haase, Assistant Attorney General, for appellee.