NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: January 28, 2025

S24A1303.  BLALOCK v. THE STATE.
S24A1304.  RYAN v. THE STATE.

BETHEL, Justice.

Appellants Damone Blalock and Rodalius Eugene Ryan, Jr., were convicted for the malice murder of Jamari Holmes, the aggravated assaults of two other individuals, and other related crimes.[1] On appeal, both Appellants contend that trial counsel

---

[1] The crimes occurred on February 23, 2019. In May 2019, a Fulton County grand jury indicted Appellants for participation in criminal street gang activity (Count 1), malice murder (Count 2), felony murder (Counts 3-5), aggravated assault with a deadly weapon (Counts 6-8), criminal damage to property in the first degree (Count 9), and possession of a firearm during the commission of a felony (Count 10). Counts 1 and 5 were bifurcated for trial; ultimately, those counts were not presented to the jury and were nolle prossed. Appellants were tried together before a jury from September 21 to October 1, 2021, and the jury found Appellants guilty on all presented counts. The trial court sentenced Appellants to serve life in prison on Count 2; ten consecutive years on Count 7; ten consecutive years on Count 8; ten concurrent years on Count 9; and five consecutive years on Count 10. The remaining counts merged or were vacated by operation of law.

Appellants each filed timely motions for new trial, which were amended several times through new counsel. Following hearings, the trial court denied the amended motions on May 20, 2024. Appellants filed timely notices of

rendered ineffective assistance in several ways. We also review whether counsel's alleged deficiencies, when viewed cumulatively, require reversal of his convictions. For the reasons that follow, we affirm.

1. Viewed in the light most favorable to the jury's verdicts, the evidence presented at trial showed the following. On the day of the crimes, Appellants, Tyherra Hartfield, and Mariah Smith were at Blalock's apartment. Hartfield invited Bernard Mitchell, Rodney Ooten, and Jamari Holmes (the "victims") to meet up with her and Smith. When the victims arrived, Hartfield and Smith got into the victims' car, and Hartfield directed them to a nearby apartment complex where Ryan resided to buy marijuana.

Upon arrival, Mitchell parked his vehicle, and the victims gave money to Hartfield, who exited the vehicle to purchase the marijuana. Hartfield returned a few minutes later and told Smith to come with her because "somebody need[ed] to see" her. Smith got

appeal, and the cases were docketed to this Court's August 2024 term. Blalock's appeal was orally argued before this Court in November 2024, and Ryan's appeal was submitted for a decision on the briefs.

2

out of the car and, when she reached the apartment stairs, heard gunshots and saw Appellants shooting at the victims' car. Neither Mitchell nor Ooten saw the perpetrators clearly enough to identify them, but both told the police they saw a shooter who was "tall with dread[lock]s" come out of the apartment breezeway with an "assault rifle shooting at the car." Mitchell also told the police he saw another shooter at the corner of the building, though Mitchell did not recall seeing a second shooter at trial. Mitchell and Ooten fled on foot after Mitchell's vehicle malfunctioned. Smith and Hartfield hid nearby until Ryan picked them up, and they returned to Blalock's apartment.

When officers arrived at the crime scene, they found Holmes, who had been shot in the back of the head, in the passenger seat of the victims' car, which had several bullet holes in the exterior. Holmes was taken to the hospital and died shortly thereafter. Investigators determined that the fatal bullet entered through the rear of the car, pierced the backseat, and exited through the front passenger seat where Holmes was sitting. A 7.62-millimeter bullet

fragment was recovered from Holmes' head during the autopsy. At the crime scene, officers recovered 7.62-millimeter shell casings and 9-millimeter shell casings. Ballistics testing showed that all the 7.62-millimeter casings were fired from the same gun, most likely a rifle, and all the 9-millimeter casings were fired from the same gun, most likely a pistol. Investigators determined that the 9-millimeter rounds were likely fired from the corner of the building close to the victims' vehicle, consistent with Mitchell's initial account of where the second shooter appeared.

After fleeing, Mitchell and Ooten called Hartfield and asked, "[W]hy they shoot at us?" Hartfield replied, "[T]hey said that y'all was parked in front of the spot." Hartfield then texted Mitchell, claiming "we [did not] set you up." Mitchell and Ooten reported Smith's and Hartfield's potential involvement to police, and shortly thereafter, officers located and interviewed the two women; the interviews were video-recorded and were admitted into evidence at trial. Although Smith initially refused to admit that she saw Appellants shooting at the victims and instead provided several

4

alternative accounts of the crimes, she ultimately admitted to seeing Appellants shoot at the victims. In contrast, the lead investigator testified that Hartfield was "not cooperative" during her interview and did not provide any information about what happened at the incident. After her interview with police, Hartfield messaged Appellants on Instagram that she "stayed solid" and told police that she did not know what happened, but that Smith was "snitching" so the police "know about [Blalock] but not [Ryan]." Blalock replied that he "knew that [Smith] was a rat," and asked what Smith said about him.

At trial, Mitchell, Ooten, Smith, and Hartfield testified for the State. Smith's explanation of events at trial aligned with the victims' testimony of what took place at the crime scene – that is, that the victims picked up Hartfield and Smith from Blalock's apartment, Hartfield directed the victims to the scene of the crime, Hartfield exited the vehicle before returning to retrieve Smith, and then shots were fired at the victims' vehicle. Smith also specifically testified that she saw Appellants fire their weapons at the victims and

5

explained that she initially lied during her interview with police because she feared retribution by Appellants. During Hartfield's testimony, she invoked her right against compelled self-incrimination numerous times because, although not charged in connection with this case, she was under indictment for other charges at the time of trial. However, Hartfield also provided some substantive answers, such as denying that she knew Ryan, denying setting up the victims, and denying directing Appellants to shoot the victims.

Appellants' theory of defense was that neither Appellant was present during the crimes. Throughout trial, Appellants implied that Hartfield and Smith were shielding the real perpetrators. Blalock argued in his opening that the reason Appellants were on trial was because Hartfield and Smith "don't want to tell what really happened." To that end, Appellants sought to persuade the jury that the State failed to present sufficient evidence to prove Appellants' guilt beyond a reasonable doubt by highlighting Smith's shifting accounts of the crimes and Hartfield's invocation of her right against

6

self-incrimination. For example, during closing, Ryan explained that "the problem" with Hartfield's invocation of her right against self-incrimination was that her silence "didn't really help [the jury] figure out what happened."

2. Both Appellants contend that trial counsel rendered constitutionally ineffective assistance by (a) failing to object and move to strike Hartfield's testimony after she invoked her right against self-incrimination in the jury's presence and failing to object to the trial court's charge on how the jury should assess Hartfield's invocation of that right; (b) failing to review and introduce certain evidence that would support Appellants' defense; and (c) not objecting to each of the prosecutor's comments on Appellants' silence during closing argument. Ryan separately argues that trial counsel was ineffective for failing to investigate his alibi. We address these arguments in turn.

To prevail on a claim of ineffective assistance, Appellants bear the burden of showing both that trial counsel's performance was professionally deficient and that they were prejudiced as a result of

7

that performance. See *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "This burden, though not impossible to carry, is a heavy one." *Blackmon v. State*, 302 Ga. 173, 175 (2) (805 SE2d 899) (2017) (citation and punctuation omitted).

To show deficient performance, Appellants must demonstrate that counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in light of the prevailing professional norms." *Butler v. State*, 313 Ga. 675, 683 (4) (872 SE2d 722) (2022) (citation and punctuation omitted). Our inquiry focuses on the objective reasonableness of counsel's performance, which we evaluate "in conjunction with the attendant circumstances" and through the lens of "counsel's perspective at the time," while also making every effort "to eliminate the distorting effects of hindsight." *Davis v. State*, 306 Ga. 140, 143-144 (3) (829 SE2d 321) (2019) (citations and punctuation omitted). "Thus, deficiency cannot be demonstrated by merely arguing that there is another, or even a better, way for counsel to have performed." Id. Nor does counsel's subjective state of mind have any bearing on our analysis. See *State*

*v. Tedder*, 305 Ga. 577, 584 (826 SE2d 30) (2019) (The fact that defense counsel "failed to articulate any strategic reasons" for his failure made "no difference because our inquiry is focused on the objective reasonableness of counsel's performance, not counsel's subjective state of mind." (citation and punctuation omitted)). Rather, "if a reasonable lawyer might have done what the actual lawyer did—whether for the same reasons given by the actual lawyer or different reasons entirely—the actual lawyer cannot be said to have performed in an objectively unreasonable way." *Scott v. State*, 317 Ga. 218, 223 (2) (a) (892 SE2d 744) (2023) (citation and punctuation omitted).

To show prejudice, Appellants "must establish a reasonable probability that, in the absence of counsel's deficient performance, the result of the trial would have been different." *Butler*, 313 Ga. at 683 (4). "It is not enough to show that the errors had some conceivable effect on the outcome of the proceeding." *Henderson v. State*, 310 Ga. 231, 240 (3) (850 SE2d 152) (2020). And if an appellant is unable to satisfy one prong of the *Strickland* test, this

9

Court is not required to examine the other prong. See *Bradley v. State*, 318 Ga. 142, 144 (2) (897 SE2d 428) (2024).

(a) In their first claim of ineffective assistance, Appellants challenge trial counsel's performance with respect to counsel's handling of the following series of events. Before Hartfield testified at trial, her attorney indicated that Hartfield would invoke her right against self-incrimination pursuant to the Fifth Amendment of the federal Constitution. Outside the jury's presence, the trial court discussed at length Hartfield's anticipated testimony with the parties and Hartfield's attorney, as well as the types of questions to which Hartfield could potentially respond without incriminating herself. The trial court emphasized several times, and the parties agreed, that Hartfield could not refuse to respond to questions that would not elicit incriminating responses. The State ultimately called Hartfield to testify. On both direct and cross-examination, Hartfield invoked her right against self-incrimination numerous times, though she also provided substantive responses to some questions. Appellants raised no objection during Hartfield's testimony to her

10

invoking her right against self-incrimination. During closing arguments, counsel relied on Hartfield's silence to argue that the State failed to present sufficient evidence to prove Appellants' guilt beyond a reasonable doubt. During deliberations, the jury submitted the following question to the trial court: "How shall we interpret pleading the Fifth?" After both the State and defense counsel assisted in crafting a response the court instructed the jury as follows:

> The Fifth Amendment to the United States Constitution guarantees that an individual cannot be compelled by the government to provide incriminating information about herself, the so-called right to remain silent. When an individual takes the Fifth, she invokes that right and refuses to answer questions or provide information that might incriminate her about this case or any other. How this concept factors in to your fact-finding and ultimate decision is for you to decide.

Appellants did not object to this instruction.

Appellants now argue that trial counsel performed deficiently by (i) failing to object and move to strike Hartfield's testimony after she invoked her right against self-incrimination in the jury's presence and (ii) failing to object to the trial court's response to the

jury's question. In support of these claims, Appellants highlight the testimony of both their trial counsel at the motion for new trial hearing, specifically, testimony that counsel had no strategic reason for not objecting to either Hartfield's invocation of the right against self-incrimination in the jury's presence or the trial court's response to the jury's question. We are not persuaded.

(i) We turn first to Appellants' argument that trial counsel were deficient by failing to object and move to strike Hartfield's testimony after she invoked her right against self-incrimination in the jury's presence. Pointing to decisions of this Court and others that have recognized the potential for unfair prejudice that may arise from a witness's assertion of her right against self-incrimination and the adverse inferences that may follow, Appellants contend that their rights to due process and to confront the witnesses against them were violated by Hartfield's assertions of that right here. See, e.g., *Davis v. State*, 255 Ga. 598, 604 (7) (340 SE2d 869) (1986) ("Neither side has the right to benefit from any inferences the jury may draw simply from the witness' assertion of

12

the privilege either alone or in conjunction with questions that have been put to him." (citation and punctuation omitted)). So, they say, trial counsel were deficient for failing to object and move to strike Hartfield's responses on that basis.

But even assuming that an objection and motion to strike Hartfield's testimony would have succeeded, we conclude that it was not an objectively unreasonable strategy to forgo objecting and moving to strike Hartfield's testimony since this strategic decision is one of several a reasonable counsel could have made. The record shows that, rather than objecting and moving to strike Hartfield's testimony, trial counsel opted to use Hartfield's testimony—or lack thereof—to bolster Appellants' theory of defense. Specifically, during closing arguments, trial counsel emphasized Hartfield's refusal to respond to questions about her role in the crimes as part of their defense that the State failed to present sufficient evidence to prove Appellants' guilt beyond a reasonable doubt. Ryan pointed out that Hartfield "declined to answer almost everything she was asked" and explained that "the problem" with Hartfield's

13

invocations was that her silence "didn't really help [the jury] figure out what happened." Both Appellants referred to Hartfield's silence in an effort to cast doubt on the evidentiary value of the inculpatory Instagram messages sent by Hartfield to Appellants that were introduced during trial, namely Hartfield's message to Appellants that she "stayed solid" after her interview with police by telling the officers that she did not know what happened, but that Smith was "snitching" so the police "know about [Blalock] but not [Ryan]." Ryan urged the jury that Hartfield's refusal to respond to questions about the Instagram messages was critical because the case "is about what is proved, not about something that is suspicious, not about what might have been . . . [i]t's about evidence." Ryan also suggested different reasons why Hartfield sent that message that did not implicate either Appellant as the shooter, concluding that "without the context of that message" the State had not proved its case. Blalock likewise emphasized the dearth of evidence presented by the State, arguing that the State's case hinged on Smith's shifting accounts of the crimes and the inculpatory Instagram messages—an

14

argument that was only strengthened by Hartfield's refusal to provide any substantive response regarding the crimes. Choosing to address Hartfield's testimony this way in closing arguments rather than objecting and moving to strike Hartfield's testimony was an objectively reasonable trial strategy and provides no basis for deficiency. See *Hartsfield v. State*, 294 Ga. 883, 889 (3) (b) (757 SE2d 90) (2014) (it is "a sound defense strategy to minimize objections [to a witness's testimony] in an effort to show the jury that the defense ha[s] nothing to hide" and to instead use the witness's testimony to counsel's advantage during closing argument); *Moon v. State*, 288 Ga. 508, 516 (9) (705 SE2d 649) (2011) ("the making of objections falls within the realm of trial tactics and strategy and thus usually provides no basis for reversal of a conviction" (citation and punctuation omitted)).

Moreover, a reasonable attorney also could have decided not to object and move to strike Hartfield's testimony to avoid drawing the jury's attention to the questions and Hartfield's invocation of her right against self-incrimination in response. See *Rashad v. State*,

15

318 Ga. 199, 213 (3) (e) (897 SE2d 760) (2024) ("It would not be objectively unreasonable for trial counsel, as a matter of trial strategy, to refrain from objecting to this testimony so as not to draw attention to it[.]").

Finally, trial counsel were not deficient for failing to object and move to strike Hartfield's testimony because Hartfield gave several substantive answers that supported, at least by implication, Appellants' defense. Hartfield denied knowing Ryan and denied setting up the victims or directing Appellants to shoot the victims. Each of these denials could help to cast doubt on Appellants' guilt. As such, it was not an objectively unreasonable strategy to forgo objecting and moving to strike Hartfield's testimony. That the jury apparently reached different conclusions about Hartfield's testimony does not mean that no reasonable attorney could have chosen this approach. See *Anderson v. State*, 302 Ga. 74, 82 (4) (805 SE2d 47) (2017) ("the law is well-settled that decisions relating to trial strategy and tactics are not to be judged by hindsight").

(ii) We now turn to Appellants' argument that trial counsel

were deficient by failing to object to the trial court's response to the jury's question because, they assert, it improperly authorized the jury to draw inferences from Hartfield's invocation of her right against self-incrimination that were adverse to Appellants. But as we have already discussed, the record reflects that, during closing arguments, trial counsel sought to capitalize on Hartfield's invocation of her right against self-incrimination as part of their theory of defense, repeatedly pointing to Hartfield's silence as demonstrative of the State's failure to produce sufficient evidence to prove Appellants' guilt. In light of that closing argument, it was not an objectively unreasonable strategy to forgo objecting to a jury instruction that permitted the jury to factor Hartfield's silence into its deliberations in hopes that the jury would view the lack of testimony from a key witness as to what happened on the night of the crimes as an indication that the State had not presented sufficient evidence to prove its case.[2] Thus, under the circumstances

---

[2] Because Appellants raise no claim of trial court error with respect to the jury instruction, we do not address whether the trial court erred by

17

of this case, we cannot say that trial counsel's decision to forgo objecting to a jury instruction that could have benefitted the defense was objectively unreasonable. See *Barboza v. State*, 309 Ga. 319, 325-326 (b) (845 SE2d 673) (2020) (trial counsel's decision not deficient where failure to object to trial court's comments could be "helpful to [a]ppellant's case"). Cf. *Hampton v. State*, 295 Ga. 665, 670 (2) (763 SE2d 467) (2014) (trial counsel not deficient where failure to object to introduction of certain evidence may have helped defense); *McKinney v. State*, 307 Ga. 129, 140 (4) (834 SE2d 741) (2019) (counsel's decision not to object to prosecutor's comments that may have "helped support the defense" not objectively unreasonable). For all these reasons, we conclude that Appellants have failed to establish that trial counsel's performance was deficient, and this claim of ineffective assistance fails.

(b) In their next claim of ineffective assistance, Appellants argue that trial counsel performed deficiently by failing to review

instructing the jury as it did. Rather, we only conclude that trial counsel were not objectively unreasonable for failing to object for the reasons discussed herein.

18

and introduce into evidence Instagram messages provided by the State during discovery that, according to Appellants, would have cast doubt on the State's theory of the case. Specifically, Appellants point to Instagram messages sent by an unidentified user who asked Mitchell how he "let" Holmes "get killed," to which Mitchell responded, "We didn't let him get killed[.] [Hartfield and Smith] set us up[.] [W]e shot ba[c]k." Mitchell reiterated in another message, "[W]e w[ere] shooting back." When asked about these messages at the motion for new trial hearing, Blalock's counsel did not recall seeing these messages during her review of the records, and Ryan's counsel testified that he was not aware of the messages before trial. Appellants argue that these messages undermine the State's ballistics evidence and testimony from investigators that two shooters fired from outside the vehicle and that none of the victims returned fire, as well as Mitchell's testimony that, although he had a gun, it was unloaded, he did not fire at anyone, and he did not see anybody else fire from within the victims' vehicle. The trial court found that trial counsel were "deficient in failing to find" the

19

Instagram messages, and the State does not dispute that finding. However, the trial court also found that Appellants had failed to establish *Strickland* prejudice as a result of this deficiency. We agree.

Although Mitchell's message about "shooting back" may cast doubt on some of the State's evidence, we cannot say that "introducing the [evidence] would have created a reasonable probability" of a different outcome — here, an acquittal. *Lee v. State*, 318 Ga. 412, 422 (b) (i) (897 SE2d 856) (2024). First, given that Mitchell claimed to have fired "back," the text messages in fact bolster evidence that shots were fired from outside the vehicle *first*. Second, the messages do nothing to undermine other strong evidence that the fatal shot came from outside the car. Investigators determined that the fatal shot entered the rear of the car, pierced the backseat, and exited through the front passenger seat where Holmes was sitting. Further, evidence showed that the fatal 7.62-millimeter bullet could not have been fired by a .22-caliber gun, which was the caliber of weapon that Mitchell admitted was on his

20

person at the time of the shooting. Third, even if Mitchell's messages were presented to the jury *and* we assume the jury would have credited them, the messages do not definitively prove that "there had only been one person shooting at the victims" as Appellants claim. Appellants appear to reason that the ballistic evidence presented at trial showed there were only two guns used at the crime scene; therefore, Mitchell's message would show there was at least one victim shooting from the car accounting for one of the guns, leaving only one shooter outside the vehicle firing the other gun at the victims. However, the State's ballistics expert testified that "*at least* two different guns" were fired but explicitly clarified that he could not testify that *only* two guns were fired. Accordingly, Appellants' argument that Mitchell's messages would have conclusively dispelled the State's theory is inaccurate.

Given these circumstances, Appellants have failed to establish a reasonable probability that the result of the trial would have been different had trial counsel reviewed and introduced into evidence the Instagram messages and, thus, have not shown the requisite

prejudice to support their claim of ineffective assistance. See *Stepp-McCommons v. State*, 309 Ga. 400, 408 (4) (b) (845 SE2d 643) (2020) (no prejudice from counsel's failure to review a witness's prior contradictory statement because, among other reasons, such evidence was not exculpatory); *White*, 293 Ga. at 827 (2) (a) (no prejudice where, even if counsel had not failed to carefully review the case files, the outcome of the trial would not have changed based on other evidence).

(c) Appellants also argue that trial counsel were ineffective for not objecting to the prosecutor's comments during closing arguments, which they contend impermissibly commented on the invocation of their right to remain silent. Again, we disagree.

During closing arguments, the prosecutor acknowledged that the defendants "carry no burden" but urged the jury to listen for Appellants' explanation in response to the following question: "[I]f [the defendants] were not committing the murders, where were they?" Appellants objected to the comment as burden-shifting, but the trial court overruled the objection. The prosecutor repeated the

question, emphasizing that "[the defendants] are both saying . . . they weren't there. Tell us where you were. We didn't hear any evidence of it, obviously, but I would still like to hear that answer." Blalock again objected to the statements as burden-shifting. The trial court sustained this objection and instructed the jury, "Tell us where they were should be disregarded"

In his rebuttal closing, the prosecutor returned to the same theme: "I wanted to hear the answer to [the] question[]: if they weren't committing the murders, where were they?" The prosecutor continued and asked, "At any point did you hear an answer to [the] question[]? I did not, because they can't. They can't answer [the] question[]. Because the answer . . . is they were committing this murder." The prosecutor continued, "The defense does not have to call a single witness or present a single piece of evidence in this case. . . . But they can if they have it. . . . But they didn't because they don't have it." Trial counsel did not object to these comments.

Pretermitting whether trial counsel were deficient by failing to

object to each of the prosecutor's purportedly improper comments,[3] Appellants have failed to establish the requisite prejudice in light of the strong evidence of their guilt, including Smith's testimony identifying them as the shooters, the victims' testimony that corroborated Smith's account of the crimes, and the inculpatory

---

[3] In a number of cases, we have said that a prosecutor may emphasize that a defendant has not "successfully rebutted or explained the State's evidence." *Kimbro v. State*, 317 Ga. 442, 452 (7) (893 SE2d 678) (2023) ("Viewed properly in context, the prosecutor's comment merely emphasized to the jury that [the defendant] had not successfully rebutted or explained the State's evidence."). See also, e.g., *Ridley v. State*, 315 Ga. 452, 458 (4) (a) (883 SE2d 357) (2023) (concluding it was not improper for the prosecutor to argue in closing that defendant had failed to rebut or explain evidence of his guilt and rejecting assertion that such comments amount to improper burden-shifting); *Johnson v. State*, 271 Ga. 375, 383 (15) (a) (519 SE2d 221) (1999) (holding that State's "make them explain" argument did not impermissibly shift the burden of proof and did not comment on defendant's failure to testify); *Ward v. State*, 262 Ga. 293, 296 (6) (a) (417 SE2d 130) (1992) (same).

In this case, however, many of us have serious concerns that some of the prosecutor's comments went beyond a permissible "make them explain" argument and instead amounted to a comment on Appellants' failure to testify. See *Pyne v. State*, 319 Ga. 776, 785 (2) (906 SE2d 755) (2024) ("[A] prosecutor may not comment on the failure of a defendant to testify, but he may argue that evidence showing guilt has not been rebutted or contradicted." (citation and punctuation omitted)). Nevertheless, because we have determined that Appellants have failed to meet their burden of showing that they were prejudiced by counsel's failure to object, we need not address whether the prosecutor's comment was, in fact, improper such that trial counsel were deficient by failing to object. See *Bradley*, 318 Ga. at 144 (2) ("The failure to demonstrate either deficient performance or resulting prejudice is fatal to a claim of ineffective assistance of counsel and obviates the need even to consider the other.").

messages sent between Appellants and Hartfield. See *Davis*, 306 Ga. at 149 (3) (i) (no prejudice from counsel's failure to object to comments during State's closing argument where the State presented "substantial evidence" of the appellant's guilt); *Strother v. State*, 305 Ga. 838, 848-849 (5) (828 SE2d 327) (2019) (no prejudice where, even assuming counsel was deficient by failing to object during closing argument, other evidence of the appellant's guilt was "very strong"). In addition, "the prosecutor's statements were not evidence, and the trial court properly instructed the jury as much." *Denson v. State*, 307 Ga. 545, 549 (3) (837 SE2d 261) (2019). This claim of ineffective assistance therefore fails.

(d) Ryan argues separately that trial counsel was deficient by failing to investigate and present his alibi to the jury. Specifically, Ryan argues counsel should have called his half-brother, who would have testified that he and Ryan were home playing video games at the time of the shooting. We disagree that trial counsel performed deficiently in this respect.

Counsel "has a duty to make reasonable investigations or to

25

make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Terry v. Jenkins*, 280 Ga. 341, 346-347 (2) (c) (627 SE2d 7) (2006) (citation omitted). Moreover, "[a] decision as to which defense witnesses to call is a matter of counsel's trial strategy and tactics and will not support a claim of ineffective assistance of counsel unless it is so unreasonable that no competent attorney would have made the decision under the circumstances." *Smith v. State*, 308 Ga. 81, 92 (4) (839 SE2d 630) (2020).

Here, trial counsel testified at the motion for new trial hearing that he was aware of the potential alibi defense but elected not to pursue it any further after he conducted a mock examination of Ryan, which did not go well. Counsel testified that he did not believe an alibi defense would be persuasive unless Ryan testified and also noted that evidence at trial contradicted the purported alibi. Counsel instead "thought it would be better to argue that there was

26

only one shooter and that the other shots came back from the alleged victims[.]"As a result, counsel elected not to investigate the alibi defense any further. Given the conflicting evidence and counsel's objectively reasonable concern about the strength of an alibi, we cannot say that counsel's strategic decision not to investigate and present Ryan's alibi defense was unreasonable. See *Smith*, 308 Ga. at 91-92 (4) (claim that counsel was ineffective for failing to investigate and present alibi defense failed where a witness placed defendant at the crime scene and counsel believed that an alibi presented by defendant's girlfriend would not be persuasive). Accordingly, this claim fails.

3. Finally, we consider whether the combined prejudicial effect of trial counsel's assumed deficiencies warrants a new trial. See *Schofield v. Holsey*, 281 Ga. 809, 811 (II) n.1 (642 SE2d 56) (2007), overruled on other grounds, *State v. Lane*, 308 Ga. 10 (838 SE2d 808) (2020). In our review of Appellants' claims, we assumed that counsel were deficient for failing to review and introduce into evidence Mitchell's two Instagram messages and failing to object to each of

the prosecutor's comments on silence in closing argument. As discussed in Divisions 2 (b) and (c), counsel's assumed failures are unlikely to have affected the outcome of the trial, and we do not see that the prejudice from these two deficiencies would cumulate in any way to cast doubt on the verdict. See *Lee*, 318 Ga. at 431 (6) (h) ("Given the relatively minor impact of counsel's assumed errors, [the appellant] has not shown that the cumulative prejudice from those assumed errors likely affected the outcome of [his] trial.") This claim, therefore, fails.

*Judgments affirmed. All the Justices concur.*