311 Ga. 238
FINAL COPY

S21A0118. GREEN v. THE STATE.

MCMILLIAN, Justice.

In March 2018, a Fulton County jury found Corey Green guilty of malice murder and other crimes in connection with the armed robbery and shooting death of Christopher Peek.[1] On appeal, Green

---

[1] The crimes occurred on October 29, 2013. On August 26, 2016, a Fulton County grand jury returned a ten-count indictment charging Green with malice murder (Count 1), four counts of felony murder (Counts 2-5), armed robbery (Count 6), aggravated assault with a deadly weapon (Count 7), criminal attempt to sell marijuana (Count 8), possession of a firearm during the commission of a crime (Count 9), and possession of a firearm by a convicted felon (Count 10). At a jury trial held from March 12 to 14, 2018, Green was found guilty on all counts except criminal attempt to sell marijuana and the related felony murder count (Counts 4 and 8). The trial court sentenced Green to serve concurrent sentences of life in prison without the possibility of parole for malice murder and armed robbery, as well as a suspended, consecutive sentence of five years for possession of a firearm during the commission of a felony and a concurrent sentence of five years for possession of a firearm by a convicted felon. The aggravated assault count merged into the malice murder conviction, and the three remaining counts of felony murder were vacated as a matter of law. On April 6, 2018, new counsel filed a motion for new trial, which was amended in October 2018. Following an evidentiary hearing in April 2019 and oral argument in November 2019, the trial court denied the amended motion for new trial on February 19, 2020. Green timely appealed, and the case was docketed to this Court's term beginning in December 2020 and orally argued on January 14, 2021.

asserts that he was improperly sentenced as a recidivist and that he received ineffective assistance of counsel when his counsel advised him not to testify at trial. For the reasons that follow, we discern no error and affirm.

The evidence at trial showed that on October 29, 2013, Green and Peek called and texted back and forth several times to arrange a meeting at a gas station for Green to sell marijuana to Peek. Peek and his friend, Brandon Carter, drove to get food nearby while they waited for Green to indicate that he was ready to meet. Carter testified that while they were waiting, a woman driving a black SUV pulled up next to them. Carter motioned to the man in the SUV's passenger seat to see if he had marijuana to sell. Carter then entered the SUV and spoke with the man. In the meantime, Peek got a call that his "friends" were across the street at the gas station, so Peek drove Carter's gold Honda Accord across the street while Carter rode over in the SUV so he could "keep an eye out" while Peek met up with his "friends."

Surveillance video recordings from the gas station showed that

Green and an unidentified man were standing next to each other when Peek arrived. Peek got out of the Accord to greet Green, then briefly went inside the gas station while Green and the other man stood together and waited. When Peek returned, all three men got into the Accord at the same time. Peek briefly exited the Accord to retrieve a bag[2] from Carter in the black SUV, which had parked directly behind the Accord, and then returned to the Accord's driver seat. After a moment, Green exited the front passenger seat of the Accord and opened the back passenger door where the unidentified man was seated. Green continued to stand there, looking around the parking lot, while the unidentified man struggled with Peek over the bag. When the man began firing a weapon at Peek, Green fled on foot. The shooter fled in the same direction, carrying the bag while he ran. Shortly thereafter, an unidentified pickup truck exited the parking lot, followed by the black SUV. Carter, who was inside the gas station at the time of the shooting, remained on the scene.

---

[2] The bag was never recovered, but Carter testified that it contained cash that Peek intended to use to purchase marijuana.

An officer with the Atlanta Police Department was exiting the ramp from I-285 in an unmarked police vehicle when he heard multiple gunshots at the nearby gas station. He observed a dark SUV exit the parking lot at a high rate of speed. As the SUV approached the exit ramp, another gunshot was fired from the front passenger side toward the gas station. The officer activated his blue lights and rushed to the gas station's parking lot. When he arrived, he was directed to a Honda Accord parked at the gas pump island with a man in the driver's seat slumped down and bleeding from an apparent gunshot wound. Despite medical intervention, Peek, who had been shot once in the chest and three times in the right arm, succumbed to his injuries.

The evidence also showed that in the weeks leading up to the shooting, Green asked Meghann Reeves, Peek's ex-girlfriend, for Peek's phone number on two separate occasions. Reeves, who only knew Green by the name "Red," gave him Peek's number after getting Peek's permission. On the day of the shooting, Peek called Reeves and told her that he was planning to meet Red later that day.

When Reeves learned of the shooting the following day, she contacted law enforcement to tell them of Peek's plans and provided them with Red's cell phone number. After reviewing the records for the cell phone number that Reeves provided, officers were eventually able to connect the prepaid phone to Green. Reeves identified Green from a photographic lineup as the individual she knew as Red. Carter also identified Green from the photographic lineup as being involved in the shooting. In November 2015, officers located Green in custody at the Cobb County jail and interviewed him regarding his involvement in the shooting. Green denied being at the gas station that day.

At trial, Rich Williams, Green's roommate, testified that Green called him on the afternoon of the shooting and told him "something's wrong" and he had a situation and needed to be picked up. However, because Green lived in a completely different area of Atlanta, he could not identify where he was other than the "west side," and Williams was not able to reach Green on his phone while he drove around to look for him. Williams's phone records showed

that Green called him at 5:52 p.m., one minute after the shooting occurred, and that Williams attempted unsuccessfully to call Green 22 times in the following 15 minutes. Williams did not see Green again for several days, and Green did not say anything about what had happened. Cell phone records showed that Green was in the area of the gas station at the time of the shooting and disabled his cell phone immediately after the shooting.[3]

1. Green claims that the trial court erred in sentencing him as a recidivist under OCGA § 17-10-7 (c). At the sentencing hearing, the State presented certified copies of five felony convictions to support the application of OCGA § 17-10-7 (c). Green not only failed to object to their introduction, but also agreed that a sentence of life without the possibility of parole was mandated. In his amended motion for new trial, Green for the first time[4] contested the use of

---

[3] For non-death penalty murder cases that were docketed to the term of court beginning in December 2020, we no longer routinely conduct a sua sponte review of the sufficiency of the evidence. See *Davenport v. State*, 309 Ga. 385, 399 (4) (b) (846 SE2d 83) (2020). Green does not contest the sufficiency of the evidence to support his convictions.

[4] Because the motion for new trial was timely filed, the trial court

6

two of his convictions because they had been entered pursuant to pleas of nolo contendere in Florida, but the trial court determined that nolo contendere pleas could be used to prove recidivism, relying on *Miller v. State*, 162 Ga. App. 730 (292 SE2d 102) (1982) ("*Miller I*"). After the hearing on the motion for new trial but shortly before the trial court issued the denial order, the Court of Appeals overruled *Miller I*, holding that OCGA § 17-7-95 (c) precluded the State's use of a nolo contendere plea entered in California for purposes of recidivist sentencing. See *Miller v. State*, 353 Ga. App. 518, 521 (1) (838 SE2d 602) (2020) ("*Miller II*").[5] Green now argues that the trial court erred by considering those pleas in sentencing him as a recidivist and requests that the case be remanded to the trial court for resentencing.

retained jurisdiction to correct or reduce the sentence under OCGA § 17-10-1 (f), and this claim was preserved for appeal. Cf. *Marshall v. State*, 309 Ga. 698, 702 (3) (848 SE2d 389) (2020) (challenge to recidivist sentence was not preserved for appeal where not raised in the trial court at sentencing or in the motion for new trial and trial counsel affirmatively waived the claim).

[5] In so holding, the Court of Appeals overruled nearly 40 years of its precedent. See *Miller I*, 162 Ga. App. at 732 (4) (b); *Phillips v. State*, 329 Ga. App. 279 (764 SE2d 879) (2014).

Before considering the recidivist statute, we must address an issue raised with respect to Green's malice murder conviction. The State contends that because the trial court was authorized to sentence Green to life without the possibility of parole for malice murder, that sentence is valid without regard to the application of the recidivist statute. See OCGA §§ 16-5-1 (e) (1) (expressly authorizing sentence of life without parole for murder conviction, regardless of defendant's prior criminal history); 17-10-2 (a) (1) ("In the [presentence] hearing the judge shall hear additional evidence in extenuation, mitigation, and aggravation of punishment, including the record of any prior criminal convictions and pleas of guilty or *nolo contendere* of the accused, or the absence of any prior conviction and pleas." (emphasis supplied)). Green concedes that the trial court had discretion to sentence him to serve life in prison without the possibility of parole, but he argues that the trial court failed to exercise that discretion because it believed that it was required to sentence him to life without parole under OCGA § 17-10-7 (c).

8

"[W]e generally presume that a trial court understood the nature of its discretion and exercised it, unless the record shows otherwise." *Williams v. State*, 306 Ga. 674, 677 (2) (832 SE2d 843) (2019). See also *Treadaway v. State*, 308 Ga. 882, 888 (2) (843 SE2d 784) (2020) ("In the absence of evidence to the contrary, we must presume that the trial court properly exercised its discretion and applied the correct standards . . . ."). Here, both the State and defense counsel argued at the sentencing hearing that life without the possibility of parole was the mandatory sentence for both malice murder and armed robbery and that the trial court did not have discretion in sentencing other than to make the sentences consecutive. And because a life without the possibility of parole sentence for an armed robbery conviction is only possible under OCGA § 17-10-7 (c),[6] it is clear that the trial court concluded that recidivist sentencing applies in this case. Under these circumstances, we agree that even though life without the possibility

---

[6] See OCGA § 16-8-41 (b) ("A person convicted of the offense of armed robbery shall be punished by death or imprisonment for life or by imprisonment for not less than ten nor more than 20 years.").

of parole is a valid sentencing option for malice murder, the record indicates that the trial court understood that it had no discretion to sentence Green to anything else. See *Williams*, 306 Ga. at 677 (2) (where prosecutor and defense attorney informed trial court that sentences had to run consecutively and the "record contains no evidence that the trial court understood its obligations differently," presumption that trial court understood the nature of its discretion was rebutted). Thus, we must consider Green's claim that the recidivist statute was erroneously applied to his convictions.[7]

Turning to the recidivist statute, OCGA § 17-10-7 (c) provides:

> [A]ny person who, after having been convicted under the laws of this state for three felonies or having been *convicted under the laws of any other state* or of the United States of three crimes which if committed within this state would be felonies, commits a felony within this state shall, upon conviction for such fourth offense or for subsequent offenses, serve the maximum time provided in the sentence of the judge based upon such conviction and shall not be eligible for parole until the maximum

---

[7] Although the State initially presented five felony convictions at the sentencing hearing, the State now concedes that one of the convictions — a July 2014 conviction after the crimes at issue in this case — does not qualify under OCGA § 17-10-7 (c). Because Green contests the trial court's use of two of the remaining four convictions, at least one of those convictions must count under the recidivist statute to authorize Green's sentence.

10

sentence has been served.

(Emphasis supplied.) When presented with a question of statutory interpretation, we begin by examining the statute's plain language, reading the text "in its most natural and reasonable way, as an ordinary speaker of the English language would." *Deal v. Coleman*, 294 Ga. 170, 172-73 (1) (a) (751 SE2d 337) (2013). Thus, when considering the meaning of a statute, "we must afford the statutory text its plain and ordinary meaning, [viewed] in the context in which it appears." Id. at 172 (1) (a) (citations and punctuation omitted). If the statutory text is "clear and unambiguous, we attribute to the statute its plain meaning, and our search for statutory meaning is at an end." Id. at 173 (1) (punctuation omitted).

Affording the statute its plain and ordinary meaning, OCGA § 17-10-7 (c) provides that a person who has been convicted of three felonies in Georgia or "convicted under the laws of any other state" for offenses that would be felonies if committed in Georgia is to be sentenced to the maximum time provided and is not eligible for parole. Thus, because the State relied on Florida offenses in seeking

11

recidivist sentencing, the plain language of this statute required the sentencing court to determine both whether Green's pleas of nolo contendere to those offenses constitute convictions under the laws of Florida, the state in which he entered the pleas, and whether those offenses would constitute felonies under the laws of Georgia.

Significantly, the General Assembly provided that, in making the substantive determination of whether a prior offense would constitute a felony, we are to look exclusively at the laws of *this state.* See *Nordahl v. State*, 306 Ga. 15, 22-23 (3) (829 SE2d 99) (2019) (OCGA § 17-10-7 (c) requires sentencing court to consider whether elements of out-of-state felony would constitute a felony under Georgia law). However, in determining whether a conviction counts for recidivist sentencing when the proffered felony was committed out-of-state, we are to look at whether the defendant has been "*convicted under the laws of any other state*[.]" OCGA § 17-10-7 (c) (emphasis supplied). Thus, the General Assembly has clearly distinguished when a sentencing court is to look to Georgia law versus when it is to look to another state's laws in determining

recidivist sentencing.

Here, Green concedes that the nolo contendere pleas at issue constitute convictions under Florida law, that no bar exists in Florida to using the convictions for recidivist sentencing, and that the crimes, if committed in Georgia, would be felonies. See *Montgomery v. Florida*, 897 S2d 1282, 1286 (Fla. 2005) ("conviction" includes plea of nolo contendere even where adjudication of guilt withheld). However, Green argues that, despite the concededly plain language of OCGA § 17-10-7 (c), under the reasoning of *Hardin v. Brookins*, 275 Ga. 477 (569 SE2d 511) (2002), OCGA § 17-7-95 (c)[8] precludes the use of out-of-state nolo contendere pleas in determining recidivist sentencing in this case. We disagree that *Hardin* should be read so broadly.

---

[8] This statute provides, in relevant part:

Except as otherwise provided by law, a plea of nolo contendere shall not be used against the defendant in any other court or proceedings as an admission of guilt or otherwise or for any purpose; and the plea shall not be deemed a plea of guilty for the purpose of effecting any civil disqualification of the defendant to hold public office, to vote, to serve upon any jury, or any other civil disqualification imposed upon a person convicted of any offense under the laws of this state. . . .

13

In *Hardin*, Anthony Brookins had pleaded nolo contendere in Florida in 1982 to a charge of possession of diazepam, a controlled substance. Brookins later moved to Georgia and, in 1998, was elected to the Seminole County Board of Education. A citizen of Seminole County filed a writ of quo warranto challenging Brookins's eligibility to hold office, relying on OCGA § 45-2-1 (3).[9] In affirming the trial court's denial of the writ, this Court began by noting that, as a Georgia citizen, Brookins had the right to hold public office unless disqualified by the Constitution and laws of this state under OCGA § 1-2-6 (a) (5). See *Hardin*, 275 Ga. at 478 ("The right of a citizen of this state to hold office is the general rule, ineligibility the exception; and therefore a citizen may not be deprived of this right without proof of some disqualification specifically declared by law." (citation and punctuation omitted)). Relying on that principle and

---

[9] This statute provides that a person is ineligible to hold public office if he or she has been "finally convicted and sentenced for any felony involving moral turpitude under the laws of this or any other state when the offense is also a felony in this state, unless restored to all his rights of citizenship by a pardon from the State Board of Pardons and Paroles."

14

the language of the second clause of OCGA § 17-7-95 (c),[10] we concluded that Brookins's eligibility must be determined under the constitutional and statutory laws of *Georgia*, rather than of the state where he entered his nolo plea. See id. at 479. And because OCGA § 17-7-95 (c) specifically provides that the entry of a plea of nolo contendere "shall not be deemed a plea of guilty for the purpose of effecting any civil disqualification of the defendant to hold public office" we held that Brookins was exempted from disqualification under OCGA § 45-2-1 (3).

Here, we are viewing the first clause of OCGA § 17-7-95 (c)'s mandate — *"[e]xcept as otherwise provided by law*, a plea of nolo contendere shall not be used against the defendant in any other court or proceedings as an admission of guilt or otherwise or for any purpose" — in light of OCGA § 17-10-7 (c)'s express direction that the sentencing court consider the effect of a plea of nolo contendere

---

[10] This Court specifically relied on the second clause of OCGA § 17-7-95 (c) that refers to "'any other civil disqualification imposed upon a person convicted of any offense under the laws of this state.'" *Hardin*, 275 Ga. at 478 (emphasis omitted). That clause is not at issue in this case.

under the laws of the state in which it was entered when determining whether to impose recidivist sentencing. (Emphasis supplied.) Because this case does not involve the second clause of OCGA § 17-10-7 (c) or the policy of applying Georgia law to determine whether a candidate is qualified for public office, our limited analysis in *Hardin* does not control here.[11] Accordingly, the trial court did not err in sentencing Green as a recidivist based on his four prior felony convictions.[12]  See OCGA § 17-10-7 (c).

2. Green also asserts that his trial counsel rendered ineffective assistance by advising him not to testify in his own defense to avoid

---

[11] Although we have doubts about *Hardin*'s largely nontextual analysis, it is not necessary for us to further address *Hardin* in the context of this case other than to make clear that its holding is limited to the disqualification of candidates for elected office in Georgia who enter nolo contendere pleas in other states.

[12] In *Miller II*, the Court of Appeals did not expressly consider the effect of a plea of nolo contendere under California law and whether it constitutes a conviction, noting only that "California recognizes the use of nolo contendere pleas. See Cal. Penal Code, § 1016 (West 1998)." *Miller II*, 353 Ga. App. at 520 (1) n.5. Thus, to the extent that the Court of Appeals failed to properly consider whether the defendant's plea of nolo contendere constituted a conviction under California law and set out a bright-line rule that nolo contendere pleas can never be considered under OCGA § 17-10-7 (c), we disapprove of that portion of *Miller II*.

16

the admission of prejudicial other acts evidence. To prevail on this claim, Green must show both that his trial counsel's performance was professionally deficient and that, but for such deficient performance, there is a reasonable probability that the result of the trial would have been different. See *Strickland v. Washington*, 466 U.S. 668, 695 (III) (B) (104 SCt 2052, 80 LE2d 674) (1984). To establish deficient performance, Green must show that counsel performed in an "objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Mosley v. State*, 307 Ga. 711, 720 (4) (838 SE2d 289) (2020) (citation and punctuation omitted). If Green fails to show either prong of the *Strickland* test, we need not examine the other. See *DeLoach v. State*, 308 Ga. 283, 288 (2) (840 SE2d 396) (2020).

The record shows that, prior to trial, the State filed a notice of intent to present other acts evidence pursuant to OCGA § 24-4-404 (b) to prove intent, knowledge, and absence of mistake, citing Green's 2017 arrest for possession of marijuana with intent to

distribute in Florida.[13] Although the State used this same incident as a basis to revoke Green's bond in this case, it did not ultimately seek to present the evidence in its case-in-chief at trial, and the trial court did not rule on its admissibility before trial. In an audio-recorded phone call from Green to a Florida law enforcement officer, which was admitted at Green's bond revocation hearing, Green admitted meeting the alleged victims in Florida for the purpose of selling four pounds of marijuana for $4,000.

During his colloquy with the trial court regarding whether he would testify at trial, Green claimed that he was not being permitted to testify because the State was going to use evidence of the prior robbery in Florida.[14] Trial counsel stated, "[I]t used to be in Georgia a defendant could make an unsworn statement and nobody could cross-examine him but now you're going to get cross-examined. They

---

[13] The charge was ultimately dismissed.

[14] The State denies that the evidence would have been used to show an alleged robbery; rather, the prosecutor would have used the evidence to show Green admitted to brokering a prior marijuana transaction, which would have supported the intent, knowledge, and absence of mistake to commit the charge of criminal intent to sell marijuana and felony murder based on that charge. We note that Green was ultimately acquitted of those two charges.

are going to be able to impeach you." When Green complained that the court had not ruled on his motion to exclude the audio recording, the trial judge explained, "[the recording] hasn't come up at this point so if you took the stand then it would become relevant so I'm going to deny the motion." After a brief recess, the trial court again explained:

> [I]f you took the stand, it could open the door and the State would be entitled to cross-examine you on that [recording] so I didn't make a ruling one way or the other. . . . So I just want to make sure you understand . . . if you got up here and testified, there is a risk that that could come in.

After equivocating several times, Green ultimately confirmed that he did not wish to testify at trial.

At the motion for new trial hearing, Green testified that, if given the opportunity, he would have sworn at trial that he was at the crime scene to buy marijuana from Peek and that he did not know the shooter. According to Green, while he was seated in the front passenger seat of Peek's car, Peek, who was also armed, argued with the shooter, who was seated in the back seat of Peek's car. Prior

to the shooting, Green exited Peek's car and attempted to open the rear passenger door to defuse the tension, but the shooter prevented the door from opening and pointed his gun at Green. In fear for his own life, Green ran and then heard gunshots.

Trial counsel testified at the motion for new trial hearing and explained that he advised Green not to testify at trial for a variety of reasons and that the Florida incident was only one of the factors. Trial counsel was more concerned about Green's criminal history and his demeanor if he testified. In addition, Green had given multiple, contradictory accounts of what happened on the date of the shooting, none of which seemed credible. The prosecutor testified at the hearing that he was prepared to impeach Green's testimony with the differences between his trial defense and his original in-custody statement, by introducing certified copies of Green's felony convictions, and through Green's audio-recorded statement. The prosecutor also expected to question Green about the gas station's surveillance video because of inconsistencies with the version of events that the defense argued at trial.

Pretermitting whether trial counsel incorrectly advised Green that the State would be permitted to impeach his testimony with the audio-recorded statement he made to a Florida law enforcement officer, Green is unable to show that his counsel performed deficiently under the circumstances of this case. A strategic decision will not form the basis for an ineffective assistance of counsel claim unless it was "so patently unreasonable that no competent attorney would have done the same." *Walker v. State*, 308 Ga. 749, 760 (4) (843 SE2d 561) (2020). Counsel's decision to advise a defendant not to testify is a strategic decision. See *State v. Goff*, 308 Ga. 330, 334 (1) (840 SE2d 359) (2020).

Here, trial counsel testified that he had multiple reasons for advising Green not to testify other than the potential admission of the other acts evidence, including Green's prior convictions, Green's prior inconsistent statements regarding the shooting, and Green's general demeanor, which was at times "very confrontational," as demonstrated by his outbursts during trial. Trial counsel was also concerned that if Green testified, he would have to explain the

shooter's arrival, and because Green told counsel that he and the shooter had arrived at the gas station together, that fact could put Green in concert with the shooter. Because trial counsel had sound, strategic reasons for advising Green not to testify at trial, Green has not shown that his trial counsel's advice against testifying was constitutionally deficient. See *Goff*, 308 Ga. at 334-35 (1) (counsel was not deficient for advising defendant not to testify where counsel was concerned that defendant would not perform well on cross-examination given defendant's unpredictable nature and prior contradictory statements); *Domingues v. State*, 277 Ga. 373, 374-75 (2) (589 SE2d 102) (2003) (counsel's advice not to testify was not ineffective where counsel had sound, strategic reasons for so advising the defendant).

*Judgment affirmed. All the Justices concur.*

Decided April 5, 2021.
Murder. Fulton Superior Court. Before Judge Krause.
*Brian Steel; John R. Greco*, for appellant.
*Paul L. Howard, Jr., District Attorney, Kevin C. Armstrong, Lyndsey H. Rudder, Assistant District Attorneys; Christopher M. Carr, Attorney General, Patricia B. Attaway Burton, Deputy*

*Attorney General, Paula K. Smith, Senior Assistant Attorney General, William C. Enfinger, Assistant Attorney General*, for appellee.