NOTICE: This opinion is subject to modification resulting from motions for reconsideration under Supreme Court Rule 27, the Court's reconsideration, and editorial revisions by the Reporter of Decisions. The version of the opinion published in the Advance Sheets for the Georgia Reports, designated as the "Final Copy," will replace any prior version on the Court's website and docket. A bound volume of the Georgia Reports will contain the final and official text of the opinion.

In the Supreme Court of Georgia

Decided: March 17, 2026

S26A0125. DILL v. THE STATE.

WARREN, Presiding Justice.

Appellant Carlos Dill was convicted of malice murder and other crimes in connection with the shooting death of Jonathan Stafford.[1] In this appeal, Dill contends that the evidence was legally

---

[1] Stafford was killed on November 26, 2021. In February 2022, a Fulton County grand jury indicted Dill for malice murder, four counts of felony murder, armed robbery, aggravated battery, aggravated assault, possession of a firearm during the commission of a felony, possession of a firearm by a convicted felon, and possession of a firearm by a convicted felon during the commission of a felony. At a trial from June 12 to 15, 2023, the jury found him guilty of all counts. The trial court sentenced him as a recidivist under OCGA § 17-10-7(c) to serve consecutive sentences of life in prison without the possibility of parole for malice murder and armed robbery and 15 consecutive years, suspended, for possession of a firearm by a convicted felon during the commission of a felony. The remaining counts were vacated or merged. Dill filed a premature motion for new trial, which ripened upon the entry of the final disposition order. See, e.g., *Fripp v. State*, 322 Ga. 269, 269 n.1 (2025). Dill later amended the motion through new counsel, and after holding evidentiary hearings, the trial court denied it on April 14, 2025. Dill filed a timely notice of appeal, which he amended twice. The case was then docketed to the term of this Court beginning in December 2025 and submitted for a decision on the briefs.

insufficient to support his convictions, the trial court abused its discretion by failing to remove a juror, and his trial counsel provided constitutionally ineffective assistance. For the reasons explained below, we affirm.

1. The evidence presented at Dill's trial showed the following. In August 2021, Dill began dating Tatiana Willis-Riley; he soon became "controlling" and "verbal[ly] abus[ive]." He "continuously call[ed her] phone"; threatened to "break in[to her] house"; tried "to break in[to her] window"; and drove by her workplace. On November 25, 2021, Willis-Riley, who lived in Atlanta, traveled to Alabama to spend Thanksgiving Day with her friend Stafford and his family. Around 6:30 p.m., Willis-Riley posted on social media a photo of Stafford preparing food. Over the next hour and a half, dozens of calls were made from Dill's social media account to Willis-Riley; Willis-Riley ignored many of the calls, but she sometimes answered and then ended the call. At some point, Stafford answered one of the calls, and Dill said, "Who the f**k are you[?]"

During this same timeframe, Dill's social media account also

2

sent many text messages to Willis-Riley. Around 6:35 p.m., Dill's account sent a text saying, "F**ked up how you couldn't spend the holiday with me but you around a whole n**ga and his folks." Willis-Riley texted that she was "done" and did not "wanna b[e] with" Dill. Dill's account texted: "You try me and put a n**ga on the phone"; "You most definitely just f**ked up with me n**ga"; "Letting a n**ga answer … I can't even do that"; and "Just disrespected me to the fullest." Willis-Riley texted that there was "[n]o love lost"; she was "not [i]n [a] relationship with" Dill; and "the feelings [she] had [were] gone." After several more exchanges, Willis-Riley texted that she was "not changing [her] mind"; she "wish[ed him] the best" and they could "b[e] friend[s]." Dill's account responded, "Just give up on me like that."[2]

Later that night, Willis-Riley and Stafford drove back to her apartment in Atlanta, arriving around 12:30 a.m. After they parked

---

[2] Willis-Riley also sent text messages to Dill's account at several points during the exchange, saying that he should "[s]top questioning" her; she planned to "block[ ]" him from texting and calling her; and he "ke[pt] calling," which was the "main reason" she no longer wanted to be with him. She also asked him to "please stop calling" and "stop texting."

3

Willis-Riley's car, they walked toward her apartment; Stafford was carrying Willis-Riley's gun. Willis-Riley suddenly heard "gunshots" and "tussling" behind her and saw Stafford "on the ground" and Dill "with a gun." Dill shot Stafford several times; took Willis-Riley's gun, which had fallen on the ground near Stafford; and then fled in a white car. Willis-Riley called 911, and Stafford was taken to a hospital, where he soon died.

Investigators obtained surveillance videos from Willis-Riley's apartment complex, which showed the following. At 7:10 p.m., more than five hours before the shooting, a white car parked at Willis-Riley's complex; a man, whom Willis-Riley identified at trial as Dill, could be seen near the car; at 7:43 p.m., the car left; it returned at 10:48 p.m. Around 12:30 a.m., Willis-Riley's car parked at the apartment complex, and Willis-Riley and Stafford walked toward Willis-Riley's apartment. Dill suddenly came into view of the cameras, ducking behind several parked cars as he quickly followed Willis-Riley and Stafford. He then ran behind Stafford and put a gun to the back of Stafford's head; they struggled for a few moments;

4

and Dill shot Stafford several times. Stafford fell to the ground as Dill ran toward Willis-Riley, who tried to grab Dill's arms. Dill then fired more shots at Stafford, took a gun that was on the ground near Stafford, and fled. Moments later, the white car pulled up near where Stafford was lying on the ground and then quickly sped away.[3]

Investigators collected six shell casings from the scene; the gun used to shoot Stafford and Willis-Riley's gun were never found. The medical examiner who performed Stafford's autopsy determined that he had six gunshot wounds, with a wound to the torso causing his death.

Dill was also shot in the torso at some point during the incident. His mother took him to a hospital in the early morning hours of November 26, 2021, and he was apprehended by

---

[3] A surveillance video showed that after Dill fled, Willis-Riley went out of view of the camera for more than two minutes, and when she returned, she stood near Stafford and used her cell phone; she did not render aid to Stafford. Willis-Riley, who was a certified medical assistant, later testified that she was "in shock" and that a neighbor told her not to touch Stafford. She also testified that she did not have a romantic relationship with Stafford.

investigators there. Dill did not testify at trial; his defense was that the shooting amounted only to voluntary manslaughter because Willis-Riley "wanted" Dill to see her with Stafford when she arrived at her apartment complex, such that he was then provoked to kill Stafford.[4]

2. Dill first contends that the evidence presented at his trial was not sufficient as a matter of constitutional due process to support his conviction for malice murder. See OCGA § 16-5-1(a) ("A person commits the offense of murder when he unlawfully and with malice aforethought, either express or implied, causes the death of another human being.").[5] He argues, as he did at trial, that the evidence supported, at most, a conviction for voluntary manslaughter because Willis-Riley brought Stafford to her apartment "in an effort to antagonize" Dill, which provoked Dill to

---

[4] The trial court instructed the jury on voluntary manslaughter.

[5] Dill makes no specific arguments about the sufficiency of the evidence supporting his remaining convictions, so we do not review them. See *Davenport v. State*, 309 Ga. 385, 398–99 (2020). See also, e.g., *Sinkfield v. State*, 318 Ga. 531, 537 n.4 (2024).

6

shoot Stafford as the result of a sudden, violent, and irresistible passion that was reasonable under the circumstances. See OCGA § 16-5-2(a) ("A person commits the offense of voluntary manslaughter when he causes the death of another human being under circumstances which would otherwise be murder and if he acts solely as the result of a sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a reasonable person[.]"). This claim fails.

In evaluating the constitutional sufficiency of the evidence, we view all of the evidence presented at trial in the light most favorable to the verdicts and consider whether any rational juror could have found the defendant guilty beyond a reasonable doubt of the crime of which he was convicted. See *Jackson v. Virginia*, 443 US 307, 319 (1979). "This Court does not reweigh evidence or resolve conflicts in testimony but rather defers to the jury's assessment of the weight and credibility of the evidence." *Jones v. State*, 314 Ga. 692, 695 (2022) (cleaned up). Moreover, "whether or not a provocation, if any, is such a serious provocation as would be sufficient to excite a

sudden, violent, and irresistible passion in a reasonable person, reducing the offense from murder to manslaughter, is generally a question for the jury." Id. (cleaned up).

Here, the jury was authorized to reject Dill's theory of voluntary manslaughter and to instead find that there was ample evidence that he formed the malice necessary to establish malice murder. See *Weston v. State*, 321 Ga. 554, 556 (2025) (explaining that the requisite criminal intent for malice murder "is that of malice, which incorporates the intent to kill" and "may be formed in an instant, as long as it is present at the time of the killing," and that "[w]hether a killing was intentional and malicious is for the jury to determine" (quotation marks omitted)). In this respect, the evidence indicated that several hours before the shooting, Dill felt "disrespected" because Willis-Riley ended their relationship and spent Thanksgiving Day with Stafford; Dill went to Willis-Riley's apartment complex at 7:10 p.m. and again at 10:48 p.m.; and he waited nearly two hours until Willis-Riley and Stafford arrived around 12:30 a.m. Dill then concealed himself behind cars in the

8

parking lot as he followed Willis-Riley and Stafford, ran behind Stafford, pointed a gun at the back of his head, shot him several times, continued to shoot after Stafford fell to the ground, and fled. Based on this evidence, the jury, which was fully instructed on voluntary manslaughter and malice murder, could have reasonably concluded that the "provocation" Dill alleged—Willis-Riley's act of walking with Stafford to her apartment—was not sufficient to excite the deadly passion of a reasonable person and that the shooting was instead intentional and malicious.

Accordingly, the evidence presented at trial was constitutionally sufficient to authorize a rational jury to reject Dill's theory of voluntary manslaughter and to find him guilty beyond a reasonable doubt of malice murder. See *Soto v. State*, 303 Ga. 517, 519 (2018) (holding that the evidence was constitutionally sufficient to support the appellant's conviction for malice murder, rather than voluntary manslaughter, because although the appellant claimed that he shot the victim after he saw her "embrace and kiss" another man, the man testified that he did not have a romantic relationship

9

with the victim and that she merely shook his hand, and "even if [they] did embrace and kiss, the jury was nevertheless authorized to conclude that such provocation would not have excited a reasonable person to kill"); *Dawson v. State*, 300 Ga. 332, 333–34 (2016) (holding that the evidence was sufficient as a matter of constitutional due process to support the appellant's conviction for malice murder, rather than voluntary manslaughter, where he sneaked into his estranged wife's house after she told him she was seeing another man, waited for them to go to sleep, stabbed them multiple times, continued to stab the man after he tried to get under the bed, and fled).[6]

3. Dill also argues that the trial court abused its discretion by failing to remove one of the jurors at his trial. We disagree.

(a) After a lunch break during Willis-Riley's testimony, one of

---

[6] To the extent Dill argues that the evidence was not sufficient under OCGA § 24-14-6 because it was solely circumstantial and failed to "exclude every other reasonable hypothesis save that of the guilt of the accused," any such claim fails. OCGA § 24-14-6 does not apply when, as in this case, there was direct evidence of the appellant's guilt. See, e.g., *Robinson v. State*, 323 Ga. 7, 12 (2025) (explaining that an eyewitness's testimony that the appellant shot toward him and the murder victim was direct evidence, such that OCGA § 24-14-6 did not apply).

the prosecutors told the trial court, outside the presence of the jury, that she had learned that Willis-Riley was in the hallway outside the courtroom with her lawyer and a victim advocate during the recess; she was "crying"; a juror "went up to [Willis-Riley] and asked if [she could] give [Willis-Riley] a hug"; the victim advocate said, "[N]o"; and the juror walked away. Dill moved for a mistrial, and, alternatively, asked the court to remove the juror.

The trial court had the juror brought to the courtroom and asked about the interaction with Willis-Riley. The juror said that she was "an empathetic person"; she "saw [Willis-Riley's] pain"; she "wanted to hug her"; and after the interaction, she "thought about" it and "caught [her]self." When asked if other jurors were nearby, the juror said she "was one of the last people to leave" the courtroom and she "got lost" for a moment in the hallway before heading in the right direction toward the elevator, where she saw Willis-Riley. The trial court then asked: "[Y]ou don't find that you are already making up your mind about what's to happen in this case because of your empathetic reaction to someone in pain?" The juror said, "I do not."

11

The juror offered to no longer serve on the jury, and the trial court responded that it would "like [her] to continue to serve as long as that's proper, and [her] feeling empathy towards anyone is not an issue." The juror then said that her desire to hug Willis-Riley "wasn't significant" and had to do with Willis-Riley's "behavior and how she felt and what [the juror] sensed at that time. It had nothing to do with the court." The trial court asked if the parties wanted to ask the juror any additional questions, and they said, "No." The trial court had the jury brought to the courtroom and instructed that it was to base its verdict solely on the evidence and "not … on sympathy or affection or favor."[7] The State then continued its direct examination of Willis-Riley.

(b) "A defendant is entitled to trial by a jury untainted by improper influence," and "[i]mproper communication with a juror raises a presumption of prejudice to the defendant, which the State must rebut beyond a reasonable doubt." *Collins v. State*, 290 Ga.

---

[7] The court gave a substantially similar instruction during its final charge.

505, 506 (2012).  We have recognized, however, that "some improper communications are inconsequential."  Id. at 507 (quotation marks omitted).  "To upset a jury verdict, the improper communication must have been so prejudicial that the verdict is deemed inherently lacking in due process."  Id. (quotation marks omitted).  See also, e.g., *Chance v. State*, 291 Ga. 241, 243–44 (2012).

The record in this case supports the trial court's finding that the improper interaction between the juror and Willis-Riley was "inconsequential."  *Collins*, 290 Ga. at 507; *Chance*, 291 Ga. at 243.  To that end, the record shows that what happened during the brief interaction at issue was undisputed, and there was no discussion about the merits of the case during that interaction.  Moreover, the interaction was not observed by or conveyed to the other jurors, and the juror who engaged in the interaction assured the court that her reaction to seeing Willis-Riley crying in the hallway was not related to Willis-Riley's testimony and that her ability to fairly assess the case was not affected by her "empathetic reaction."  Under these circumstances, the trial court was authorized to conclude that

although the improper interaction was presumptively prejudicial, see *Collins*, 290 Ga. at 507, the State rebutted that presumption beyond a reasonable doubt. See *Chance*, 291 Ga. at 243–44 (concluding that the trial court did not abuse its discretion by deciding not to remove a juror who communicated with an assistant district attorney about his upcoming wedding during the appellant's trial because the communication was not about the merits of the case; the communication was "quickly terminated"; the juror "indicated that he could still be fair and impartial and decide the case based on the evidence"; and the "very brief contact was immediately brought to the trial court's attention," such that "the prosecutor rebutted any presumption of harm"); *Collins*, 290 Ga. at 507 (holding that the trial court did not err by refusing to remove a juror after a member of the victim's family approached the juror and asked the juror to tell a mutual friend that she was "still looking for a job," as the communication was "clearly inconsequential, because the record leaves no reasonable doubt that the juror contact caused no prejudice to [the a]ppellant" (quotation marks omitted)); *State v.*

14

*Clements*, 289 Ga. 640, 643 (2011) (concluding that the record supported the trial court's determination that a juror's discussion of her selection for jury service with her husband was "inconsequential in light of the uncontradicted evidence" that the juror did not discuss the merits of the case, such that the improper communication "was not so prejudicial as to have contributed to the conviction and was harmless beyond a reasonable doubt").

And to the extent Dill contends that the trial court abused its discretion by failing to remove the juror because her attempt to hug Willis-Riley showed that she believed Willis-Riley's testimony and had thus formed an opinion about Dill's guilt, any such claim fails.[8] "OCGA § 15-12-172 vests the trial court with broad discretion to replace a juror with an alternate at any point during the proceedings where, among other reasons, it is shown that the juror is unable to perform his or her duty or legal cause exists." *Morrell v. State*, 313

---

[8] Dill does not expressly assert that the presumption of prejudice that applies to his claim that the juror's attempt to hug Willis-Riley was an "improper communication," see, e.g., *Collins*, 290 Ga. at 506, also applies to his argument that the juror had formed an opinion about his guilt.

Ga. 247, 263 (2022).[9]  "To excuse for cause a selected juror in a criminal case on the statutory ground that her ability to be fair and impartial is substantially impaired, a challenger must show that the juror holds an opinion of the guilt or innocence of the defendant that is so fixed and definite that the juror will not be able to set it aside and decide the case on the evidence or the court's charge on the evidence."  Id. (quotation marks omitted).

Here, the trial court asked the juror who tried to hug Willis-Riley whether she was "already making up [her] mind about what's to happen in this case because of [her] empathetic reaction," and the juror replied that she was not.  And, as discussed above, the juror assured the court that her attempt to hug Willis-Riley was related only to Willis-Riley's "behavior" in the hallway, not her testimony in the courtroom.  The juror did not express a fixed opinion about Dill's guilt or innocence.  Nor did she indicate that she would not be able

---

[9] OCGA § 15-12-172 says, in pertinent part, "If at any time, whether before or after final submission of the case to the jury, a juror dies, becomes ill, upon other good cause shown to the court is found to be unable to perform his duty, or is discharged for other legal cause, the first alternate juror shall take the place of the first juror becoming incapacitated."

16

to decide the case based on the evidence presented at trial and the trial court's instructions, including the court's instruction that the jury was not permitted to base its verdict "on sympathy or affection or favor." Thus, the trial court did not abuse its discretion by deciding not to remove the juror. See, e.g., *Morrell*, 313 Ga. at 263–64 (holding that the trial court did not abuse its discretion by deciding not to remove a juror whose "boyfriend's mother was killed and the defendant [in that case] was found not guilty after a trial" because even though the juror told the trial court outside the presence of the rest of the jury that she did not expect to "get this emotional" and expressed doubts about her ability to remain impartial, she "did not express a fixed opinion about [the appellant's] guilt or innocence and did not "unequivocally indicate that she would be unable to decide the case based upon the evidence presented at trial and the trial court's instructions"); *Clements*, 289 Ga. at 644–45 (concluding that the trial court did not abuse its discretion by determining from the juror's "answers to [the judge's] targeted questions" that even though she expressed concern that her

17

husband, who had coached the appellant, might have difficulty getting a coaching job "due to the outcome of th[e] trial," the juror "was truthful and sincere as to her assertion that she had no fixed and definite opinion about [the appellant's] guilt or innocence and that she was able to set aside her concern about the impact of any verdict on her husband's future job and decide the case based upon the evidence or the court's charge upon the evidence" (quotation marks omitted)).[10]

4. Finally, Dill claims that his trial counsel provided constitutionally ineffective assistance by failing to disclose certain evidence to the State before attempting to introduce it at trial and by failing to prepare Dill for cross-examination, which, he says, resulted in "an involuntary waiver of his right to testify." To prevail

---

[10] Dill also seems to argue that the trial court abused its discretion by failing to question each juror about the interaction and by failing to grant his motion for a mistrial, but he did not separately enumerate those issues as error. See, e.g., *Moss v. State*, 323 Ga. 143, 148 n.6 (2025). And in any event, they are not preserved for our review because Dill failed to request that the trial court question each juror, see *Clark v. State*, 315 Ga. 1, 5 (2022), and he failed to renew his motion for a mistrial after the trial court gave its curative instruction, see *Clark v. State*, S26A0250, slip op. at 7 (Ga. Feb. 3, 2026) (2026 WL 271243).

18

on these claims, Dill must establish that trial counsel's performance was constitutionally deficient and that he suffered prejudice as a result. See *Strickland v. Washington*, 466 US 668, 687 (1984); *Blalock v. State*, 320 Ga. 694, 697 (2025). To prove deficient performance, Dill must show that counsel "performed at trial in an objectively unreasonable way considering all the circumstances and in the light of prevailing professional norms." *Blalock*, 320 Ga. at 697 (quotation marks omitted). See also *Strickland*, 466 US at 687–91. To prove prejudice, Dill must establish a reasonable probability that, but for counsel's deficient performance, the result of the trial would have been different. See *Strickland*, 466 US at 694; *Blalock*, 320 Ga. at 697. We need not address both parts of the *Strickland* test if Dill does not meet his burden of establishing one. See *Strickland*, 466 US at 697; *Blalock*, 320 Ga. at 697. As discussed below, Dill's ineffectiveness claims fail.

(a) Dill asserts that trial counsel was ineffective for failing to timely disclose to the State evidence of a screenshot of his phone, which indicated that at 12:30 a.m. on November 26, 2021, moments

before the shooting, there was a "missed call" from Willis-Riley's phone. The trial court ultimately excluded the evidence on the ground that it was not timely disclosed. See OCGA § 17-16-4(b)(1).[11] At the hearing on Dill's motion for new trial, trial counsel testified that she wanted to use the evidence of the missed call to "contradict[ ] the State's theory that it was … Dill initiating all contact and getting nothing back from [Willis-Riley]" and that Willis-Riley's "reaching out to [Dill] would [have] support[ed the] theory that [Dill] acted out of passion" when he killed Stafford. Assuming (without deciding) that trial counsel performed deficiently by failing to timely disclose the evidence of the missed call, which led to its exclusion at trial, Dill has not shown a reasonable probability that the outcome of his trial would have been different if the evidence had been admitted.

To begin, the evidence showing that Willis-Riley's phone called Dill a few minutes before the shooting would have done little to

---

[11] Dill does not contend that the trial court abused its discretion by excluding the evidence, and we express no opinion on that issue.

20

undermine the substantial evidence indicating that Dill harassed Willis-Riley by repeatedly calling and texting her that day. The State presented evidence that dozens of calls were made from Dill's social media account to Willis-Riley between around 6:30 p.m. and 8:00 p.m. on November 25, 2021; Willis-Riley ignored most of the calls; and when she sometimes answered, she soon ended the call. Dill's account also repeatedly texted Willis-Riley during the same timeframe, despite her responses that she no longer wanted to be in a relationship with Dill and her requests that he stop calling and texting. In sum, the evidence of a single missed call from Willis-Riley to Dill near the time of the shooting would have had little, if any, effect on the jury's assessment of the other, substantial evidence indicating that Dill refused to leave Willis-Riley alone. See, e.g., *Blalock*, 320 Ga. at 702 (concluding that the appellants had not shown prejudice from trial counsel's failure to introduce certain evidence that the appellants claimed would have undermined the State's ballistics evidence because the evidence "d[id] nothing to undermine other strong evidence" showing where the fatal shot was

fired from).

Moreover, the evidence of the missed call would not have added any significant support to Dill's theory that the killing amounted to voluntary manslaughter, rather than malice murder. Indeed, the screenshot showing the missed call did not establish why Willis-Riley might have called Dill or even that she called him purposely, as opposed to by accident. And as discussed above, the State presented strong evidence establishing that Dill acted with malice when he shot Stafford. In this respect, the evidence showed that after calls and texts were repeatedly initiated from Dill's social media account to Willis-Riley, including a text about how she "disrespected" Dill by spending Thanksgiving Day with Stafford, Dill went to Willis-Riley's apartment complex and lay in wait before he ambushed Willis-Riley and Stafford, shot Stafford six times, and then fled. By contrast, the evidence supporting Dill's theory that the killing amounted only to voluntary manslaughter was not particularly compelling. A reasonable juror likely would have rejected the idea that the alleged provocation—Dill seeing Willis-

22

Riley and Stafford walk to her apartment together—was sufficient to provoke in a reasonable person an irresistible passion to kill Stafford. See OCGA § 16-5-2(a). And it is not probable that the evidence of the single missed call from Willis-Riley would have persuaded the jury to conclude that Dill was reasonably provoked and thus guilty of voluntary manslaughter instead of malice murder.

Thus, Dill has not established a reasonable probability that the outcome of his trial would have been different if trial counsel had timely disclosed to the State the screenshot showing the missed call, such that it would not have been excluded from evidence on that ground. Accordingly, this claim of ineffective assistance fails. See *Blalock*, 320 Ga. at 702. See also *Isaac v. State*, 319 Ga. 25, 31–32 (2024) (holding that trial counsel was not ineffective because the appellant had not established prejudice from counsel's failure to present certain evidence, in light of the "strong" evidence of the appellant's guilt); *Harper v. State*, 318 Ga. 185, 193 (2024) (concluding that the appellant's trial attorneys were not ineffective

for failing to introduce certain evidence because the appellant could not show prejudice, as he had not established that the evidence could have "successfully bolstered his trial counsel's defense strategy at trial").[12]

(b) Dill also claims that trial counsel was ineffective for failing to prepare him for cross-examination, which, he says, resulted in "an involuntary waiver of his right to testify." Specifically, Dill asserts that before trial, he decided that he would not testify, so he "was not prepared to take the stand"; after the trial court excluded the evidence of the missed call from Willis-Riley's phone, counsel failed to "re-address the issue" of whether Dill wanted to testify, and "[a]s

---

[12] In his appellate brief, Dill baldly asserts that we should presume prejudice because his ineffectiveness claim falls into the "constructive denial of counsel" exception to *Strickland*. But as we have explained, "this exception … applies only when there is a breakdown in the adversarial process, such that counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Isaac*, 319 Ga. at 29 (cleaned up). Because counsel's failure to timely disclose the screenshot of the missed call is not the sort of "complete" failure to subject the State's case to meaningful adversarial testing to which a presumption of prejudice applies, we apply the *Strickland* standard. Id. at 30 (explaining that for the constructive denial of counsel exception to apply, counsel's failure must be "complete and occur throughout the proceeding and not merely at specific points" (quotation marks omitted)). Cf., e.g., *Blalock*, 320 Ga. at 702 (applying the *Strickland* standard to a claim that trial counsel was ineffective for failing to introduce certain evidence at trial).

a result, [Dill] could not make a voluntary and informed decision as to whether he should take the stand in his defense." Dill has not established that counsel performed deficiently in this respect.

The record shows that after the trial court excluded the evidence of the missed call from Willis-Riley's phone, the court explained to Dill that he had a right to testify, "no one c[ould] prevent [him]" from testifying, and whether to testify was his decision. The trial court then asked Dill if he wanted to testify, and he said, "No."

At the hearing on Dill's motion for new trial, trial counsel testified that before trial, Dill "did not seem interested" in testifying; she did not believe "that he could add anything by testifying"; she did not "go through a sample cross examination" with Dill because the decision not to testify was made prior to trial, and she informed Dill that he had a right to testify and that whether to testify was ultimately his decision. She also testified that after the trial court excluded the evidence of the missed call, she did not ask Dill again if he wanted to testify, and she had no strategic reason for failing to

25

do so. Dill testified at the hearing that on the day of jury selection, he and trial counsel discussed whether he would testify, and he decided not to testify; his decision did not rest on the assumption that the evidence of the missed call would be admitted; after the trial court excluded the evidence of the missed call, he and counsel had another conversation about whether he would testify; counsel advised Dill not to testify because she was concerned that he might admit guilt; Dill made the ultimate decision not to testify; and Dill was also concerned that if he testified, he might have "sa[id] some things that were close to admitting guilt."

"A strategic decision will not form the basis for an ineffective assistance of counsel claim unless it was so patently unreasonable that no competent attorney would have done the same." *Green v. State*, 311 Ga. 238, 246 (2021) (quotation marks omitted). Such strategic decisions include the decision to advise a defendant not to testify. See id. Moreover, "the decision whether to testify in one's own defense is a tactical decision to be made by the defendant himself after consultation with trial counsel." *State v. Goff*, 308 Ga.

26

330, 334 (2020) (quotation marks omitted).

Here, counsel testified at the motion for new trial hearing that she determined that Dill's testimony would not "add anything" to his defense. And the evidence presented at the hearing supports a finding that Dill did not express a desire to testify and that he and counsel were concerned that if he did so, he might admit guilt. Thus, counsel's decision not to spend time prior to trial preparing Dill for cross-examination was objectively reasonable.

And although Dill now argues that trial counsel should have revisited the issue of whether Dill wanted to testify after the trial court excluded the evidence of the missed call from Willis-Riley's phone (and counsel testified at the motion for new trial hearing that she failed to revisit the issue and had no strategic reason for that failure), the trial court was authorized to credit Dill's testimony at the hearing that counsel did in fact consult with him about testifying after the evidence was excluded and that she advised him not to testify because she was concerned that he would admit guilt. See *Anthony v. State*, 311 Ga. 293, 297 (2021) (explaining that a trial

27

court is authorized to credit a witness's testimony at the motion for new trial hearing, even though it conflicts with other testimony at the hearing, and that "in the absence of explicit factual and credibility findings by the trial court, we presume implicit findings were made supporting the trial court's decision" (quotation marks omitted)). And even if the trial court credited counsel's testimony on this point, a reasonable lawyer could have concluded that the exclusion of the evidence of the missed call would not have affected Dill's decision not to testify, particularly given counsel's assessment that Dill's testimony would not have been helpful, her concern (which Dill shared) that he might admit guilt, and Dill's assertion at the motion for new trial hearing that the decision not to testify never rested on an assumption that the evidence of the missed call would be admitted.

Moreover, the record shows that trial counsel and the trial court advised Dill that he had a right to testify and that the decision whether to testify was ultimately his to make. And Dill testified at the motion for new trial hearing that he personally made the

28

decision not to testify. See *Nabors v. State*, 320 Ga. 43, 50 (2024) ("[W]hen a defendant has been advised of his rights and makes an informed decision after consultation with trial counsel, a defendant's failure to testify on his own behalf [is not] in any way connected to any alleged deficiency of his trial counsel." (cleaned up)).

For all of these reasons, Dill has not established that trial counsel performed deficiently with respect to Dill's decision not to testify. And that means that his claim of ineffectiveness fails. See *Goff*, 308 Ga. at 334 (holding that trial counsel was not deficient for advising the defendant against offering testimony in support of his voluntary manslaughter theory because counsel was concerned about how the defendant would perform on cross-examination and because "a decision by [the defendant] to testify would have carried the significant risks inherent in testimony by a defendant"); *Gibson v. State*, 290 Ga. 6, 12 (2011) (concluding that trial counsel was not deficient for failing to call the defendant to testify because the defendant never indicated that he wanted to testify and he was advised that the decision whether to testify was his to make); *Wright*

*v. State*, 285 Ga. 428, 434 (2009) (rejecting the defendant's claim "that her attorneys were ineffective by strongly advising her not to testify at trial, and consequently, by failing to prepare her to testify, thereby constructively denying her right to do so" because the defendant was informed that whether to testify was her decision, she affirmed that it was her personal decision not to testify, and her attorneys testified at the motion for new trial hearing that they advised her not to testify out of tactical concerns; and noting that "[i]nasmuch as counsel's goal was to keep [the defendant] from taking the stand, counsel cannot be found to have been deficient for any failure to prepare [her] to testify").

*Judgment affirmed. All the Justices concur.*